#29333, #29337-r-PJD
**2022 S.D. 23**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

#29333

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

KEVIN XAVIER DICKERSON,                    Defendant and Appellant.

---

#29337

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

ARIANNA CHERELLE REECY,                    Defendant and Appellant.

* * * *

APPEALS FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE ROBIN J. HOUWMAN
Judge

JASON R. RAVNSBORG
Attorney General

ERIN E. HANDKE
QUINCY R. KJERSTAD
Assistant Attorneys General
Pierre, South Dakota                    Attorneys for plaintiff and
                                            appellee.

* * * *

ARGUED
MAY 24, 2021
OPINION FILED **04/20/22**

*  *  *  *

CHRISTOPHER MILES of
Minnehaha County Public
    Defender's Office
Sioux Falls, South Dakota

MARK KADI of
Minnehaha County Office of
    the Public Advocate
Sioux Falls, South Dakota

Attorneys for defendant and
appellant Kevin Dickerson.

Attorneys for defendant and
appellant Arianna Reecy.

DEVANEY, Justice

[¶1.]     A jury found co-defendants Arianna Reecy and Kevin Dickerson guilty of robbery and burglary and also found Dickerson guilty of aggravated assault against Julio Gomez Rojas. Reecy and Dickerson separately appeal. They both assert that the circuit court erred in precluding any reference to Gomez Rojas's immigration status and in admitting into evidence an exhibit listing transactions purportedly from Gomez Rojas's debit card. Dickerson additionally asserts that the circuit court erred in denying his motion for judgment of acquittal. We consolidate the appeals and reverse and remand.

## Factual and Procedural Background

[¶2.]     Arianna Reecy worked as an exotic dancer at a bar in Lesterville, South Dakota. In July 2019, Reecy, who went by the name "Kisses," met Julio Gomez Rojas at the bar after he asked her for a private dance. Gomez Rojas explained that he found Reecy attractive and was interested in her. The two began exchanging text messages and also spoke to each other on the phone.

[¶3.]     On November 19, 2019, Reecy asked Gomez Rojas, via text message, to lend her money so she could feed her children. He agreed and invited Reecy to come to his apartment. She arrived at approximately 7:30 p.m. but only stayed for three to five minutes. She returned to the apartment building approximately an hour later. As the two went up the stairs to Gomez Rojas's apartment, Reecy's boyfriend, Kevin Dickerson, entered the building unbeknownst to Gomez Rojas. What happened thereafter is disputed. According to Gomez Rojas, after they were inside his apartment, Reecy opened the door for Dickerson to enter, after which Dickerson

held him at gun point, assaulted him, and stole his wallet. In contrast, Reecy claimed that after she and Gomez Rojas were inside his apartment, he tried to rape her, and she struck him on the head with a cellular phone before fleeing.

[¶4.]		After the incident, Gomez Rojas's neighbors, who had heard him screaming, called 911, and an investigation ensued. Dickerson and Reecy were eventually arrested, and both were charged with first-degree robbery with a dangerous weapon and alternative counts of first-degree burglary. Dickerson was also charged with alternative counts of aggravated assault, and the State filed a part II information alleging Dickerson to be a habitual offender. Dickerson and Reecy both pled not guilty.

[¶5.]		Dickerson and Reecy were tried together. On the day prior to trial, the State filed a motion in limine to preclude defense counsel from referring in any manner to Gomez Rojas's immigration status. The State acknowledged that he was an illegal immigrant; however, it claimed that his immigration status was not material to any issue at trial. The State further asserted that the evidence would be more prejudicial than probative. Finally, the State argued that admitting the evidence would potentially place Gomez Rojas in a position of having to invoke his right against self-incrimination.

[¶6.]		At the start of the trial, the circuit court heard arguments from counsel on the State's motion and allowed the parties to examine Gomez Rojas for purposes of the court's ruling. Gomez Rojas admitted he was in the United States illegally. He testified that approximately a week after the incident, he consulted with an immigration attorney to learn whether his contacts with law enforcement as a

victim of a crime would have any adverse effect on his immigration status. He claimed that the attorney told him he could continue to cooperate with the investigation and that at some point he could apply for a special visa available to victims of crimes, called a U-Visa.[1] Gomez Rojas testified that he had not yet applied for a U-Visa, "but if it comes to that point perhaps, yes, of course" he would.

[¶7.]     Counsel for both Reecy and Dickerson argued that Gomez Rojas's immigration status is relevant and probative to his bias and motivation to lie. Counsel for Dickerson emphasized that credibility is the central issue in the case and to exclude the evidence would violate Dickerson's Sixth Amendment right to confront and cross-examine Gomez Rojas. Counsel for Reecy highlighted that it is immaterial that Gomez Rojas has not yet applied for a U-Visa because he sought information from an immigration attorney shortly after the incident who made him aware that he could apply for it in the future. Reecy's counsel further claimed that because rape is a deportable offense, the evidence is necessary and relevant to Reecy's defense that Gomez Rojas tried to rape her and then had to come up with a different story of what transpired to avoid deportation.

---

1.     The U-Visa program was created by Congress in 2000. As one court explained, "A U-Visa enables victims of certain crimes, including domestic violence [and other crimes, such as felonious assaults in general], to reside lawfully in the United States for a period of four years, which may be extended upon certification by a law enforcement official that the individual's continued presence in the United States is necessary to assist in the investigation or prosecution of criminal activity." *Romero-Perez v. Commonwealth*, 492 S.W.3d 902, 906 (Ky. Ct. App. 2016) (citing 8 U.S.C. §§ 1101(a)(15)(U)(iii), 1184(p)(6)). The program also allows the recipient of the U-Visa to apply for lawful permanent residency three years after having resided continuously in the United States following receipt of the U-Visa. *Id.*

[¶8.]	The circuit court granted the State's motion in limine. It noted serious public policy concerns associated with allowing evidence of a victim's immigration status, including that it might deter people from reporting crimes. The court also relied upon Gomez Rojas's testimony that no one had promised him anything in exchange for his testimony. The court thus concluded that his immigration status was of limited relevance and was more prejudicial than probative. The court further expressed a concern that allowing admission of such evidence would require a minitrial as to Gomez Rojas's status.

[¶9.]	During the three-day trial, multiple witnesses testified, including Gomez Rojas, his neighbors, Reecy, and multiple law enforcement officers. The jury also watched surveillance videos from the apartment complex showing Reecy and Dickerson enter and exit the building; listened to a recording of a 911 call; and observed the photographs documenting a wound above Gomez Rojas's left eyebrow and bruises on Reecy's arm and neck.

[¶10.]	Gomez Rojas testified about his relationship with Reecy. He admitted that he was attracted to her and had hopes that their relationship would turn physical. He claimed that he had lent Reecy $200 when she first came to his apartment on the evening of the incident. He testified that she was in his apartment for only a few minutes but promised to return. He believed it was possible something sexual would happen when she returned.

[¶11.]	Gomez Rojas then related that after he and Reecy entered the apartment during her second visit, he locked the door and sat down on his sofa. He claimed that Reecy asked him if anyone else was home. He said no, and thereafter,

Reecy unlocked the door to the apartment, after which she moved away from the door and a male (later identified as Dickerson) with a mask on his face charged into the apartment. Gomez Rojas testified that he did not recognize Dickerson. He further testified that Dickerson grabbed him by the back of the neck, pointed a gun at him, and demanded money.

[¶12.] According to Gomez Rojas, Dickerson then ordered Reecy to search the apartment for money, and Dickerson grabbed Gomez Rojas's wallet from a table, opened it, and threw it on the floor after noticing that it contained no cash. Gomez Rojas claimed that he was able to wrangle free of Dickerson's grip, but Dickerson then struck him on the left side of his head with the gun. He testified that he fell on the floor after being hit but got up and retreated to the bathroom. Gomez Rojas also testified that he screamed for help and waited to exit his bathroom until he stopped hearing noises.

[¶13.] When Gomez Rojas came out of his bathroom, he noticed that his neighbors, Sylvia Paragonzalez and Sofia Parada, were inside his apartment. They had heard a scream coming from his apartment and attempted to enter but could not open the door. Sylvia and Sofia also claimed that they saw a black male and a female exit Gomez Rojas's apartment and run down the stairs. Neither recalled seeing a mask covering the man's face or a gun. They were then able to enter the apartment where they found Gomez Rojas bleeding from an injury on the side of his head. According to Gomez Rojas, Sylvia and Sofia asked him if he wanted them to call 911 and he said yes; but according to Sofia, she and her sister decided to call the police. After Sofia called 911, the dispatcher asked her questions about the

incident. Sofia translated these questions to Gomez Rojas in Spanish. She then translated Gomez Rojas's answers in English. She relayed that two people entered the apartment, assaulted Gomez Rojas, and left with his wallet. She further relayed Gomez Rojas's descriptions of them and his statement that he recognized the female but not the male.

[¶14.]       Officer Christian O'Brien arrived at the apartment in response to the 911 call and interviewed Gomez Rojas. He observed that Gomez Rojas had a large gash above his left eyebrow and that the area around the wound had started to swell. During the interview, Gomez Rojas provided many details consistent with his trial testimony. However, some differences identified by Officer O'Brien during Gomes Rojas's trial testimony included Gomez Rojas's initial statement to the officer that Reecy let herself into his apartment because he had left the door unlocked and that he saw Dickerson and Reecy leave the apartment and drive away in a sport utility vehicle with Iowa license plates.

[¶15.]       Officer O'Brien testified that following his initial interview, Gomez Rojas was transported to the hospital to address his injury. While there, Officer O'Brien continued to discuss the incident with him. Gomez Rojas told Officer O'Brien that he had met Reecy a few months prior at the bar she works at in Lesterville and only knew her by the name of Kisses. He also explained that she had come over to his apartment approximately a month and a half ago. He provided Officer O'Brien with Reecy's phone number but did not inform the officer that he had been exchanging text messages with Reecy throughout the day of the incident. Officer O'Brien asked Gomez Rojas about the contents of his wallet and learned that

the wallet contained a debit card. The officer asked Gomez Rojas to determine if any transactions had been attempted with his card. Gomez Rojas looked up his account information on his phone and confirmed that no transactions had been made, and upon advice of Officer O'Brien, he then froze his debit card.

[¶16.] Detective Scott Vandervelde also testified. He had been assigned to investigate the incident, and during his investigation, he interviewed Gomez Rojas, Sofia, and Sylvia. He also obtained the apartment building's surveillance videos from the date of the incident. After watching the videos, the detective noted a discrepancy between what Gomez Rojas had told Officer O'Brien and what the videos depicted. In particular, the videos revealed that Gomez Rojas let Reecy into the apartment building rather than Reecy simply letting herself into his apartment. Detective Vandervelde spoke to Gomez Rojas about the videos, and Gomez Rojas explained that he let Reecy into the apartment that evening because he believed she wanted to get to know him better and he wanted to see how their physical relationship would play out. However, like his omission in his interview with Officer O'Brien, Gomez Rojas did not inform Detective Vendervelde that he and Reecy had been exchanging text messages throughout the day, and at no point did the detective obtain Gomez Rojas's phone or messaging history as evidence.

[¶17.] The day after the incident, Gomez Rojas's bank, MetaBank, contacted him about certain transactions that were attempted with his debit card. He testified that he informed Detective Vandervelde about these transactions and the two met at MetaBank to obtain information related to the transactions. At trial, the State sought to admit a printout purportedly from MetaBank, which, according

to the State, detailed transactions attempted with Gomez Rojas's debit card after the incident. Dickerson and Reecy objected, asserting that the document was hearsay and lacked adequate foundation. The court instructed the State to lay additional foundation. Gomez Rojas testified that the document was the one provided to him by MetaBank and that it contained a list of transactions made or attempted with his debit card. The court overruled the objection and admitted the document under the business records exception to the hearsay rule. Thereafter, Gomez Rojas testified that only the first three transactions on the list were ones he recalled making himself and that he did not make any of the other transactions.

[¶18.] Detective Vandervelde also testified about the transaction document from MetaBank. He claimed that he and Gomez Rojas had obtained the printout from an employee of the bank, and while at the bank, he and Gomez Rojas went through each of the listed transactions. According to Detective Vandervelde, there were 22 total transactions, and Gomez Rojas identified only three that he had made. Detective Vandervelde testified that while some of the information on the document had meaning to him (date, time, and business name), he did not know the meaning of some of the numbers associated with the transactions. In particular, Detective Vandervelde claimed that he interpreted the time stamp to be Eastern time because of an "ET" in parenthesis. From this, he concluded that the attempted transactions on Gomez Rojas's account occurred between 9:43 p.m. and 10:56 p.m. on November 19. He testified that this pattern of spending is consistent with what he sees in card theft cases. However, he explained that he could not obtain additional

information about the transactions, such as who attempted to use the debit card, because none of the transactions were completed.

[¶19.]        Officer Chase Vanderhull, who participated in the arrest of Dickerson and Reecy, testified that during the search of the vehicle in which the two were stopped, he found 40-caliber bullets in a plastic bag in the center console.  He did not find a gun.  Officer Vanderhull further testified about a recording of his interaction with Reecy while he was placing her in his vehicle.  On the video recording, which was admitted into evidence, Reecy can be heard complaining about her arm hurting as her hands were being cuffed behind her back.  Officer Vanderhull noticed bruising on her hand and asked her what had happened.  Reecy explained that she was injured during her work as a pole dancer.

[¶20.]        After the State rested its case, Dickerson and Reecy moved for judgment of acquittal on all counts.  The court denied the motion.  Thereafter, Dickerson presented testimony from Derek Kuchenreuther, a computer forensic examiner.  Kuchenreuther testified that he obtained a text message and call log from Verizon for Gomez Rojas's phone number for November 19, 2019.  He then explained how the exhibit detailed who sent the text, if it was received, and by whom.  He identified that approximately 75 text messages were sent between the number associated with Reecy and the number associated with Gomez Rojas on November 19.  He also testified that the phone record depicted approximately four calls between Reecy's phone and Gomes Rojas's and claimed that it appeared that the two were calling each other in equal amounts.  The phone record also depicted a

message containing a picture; however, Kuchenreuther testified that he could not obtain the actual picture that was sent.

[¶21.] Reecy testified in her defense. She agreed that she had asked Gomez Rojas to loan her money and that she went to his apartment twice on November 19, 2019. However, she disagreed that Gomez Rojas lent her $200. Rather, she claimed she went to his apartment the first time believing he was going to lend her approximately $300. When she got to his apartment, he told her that he only had $20, so she suggested he could transfer her additional funds with what she called a "cash app." Gomez Rojas did not have the app, and according to Reecy, he instead gave her his debit card. Reecy further testified that when she began to leave his apartment during that first visit, Gomez Rojas blocked the door and asked her to have sex with him. She claimed that she told him no, but she promised she would return. She also testified that before he allowed her to exit the apartment, he reached out for a hug, and while she hugged him back, he tried to kiss her.

[¶22.] According to Reecy, approximately an hour after she left his apartment, Gomez Rojas sent her a text message with a picture of cash, indicating that he had more money for her to borrow and that he would like his debit card returned.[2] She agreed to return to his apartment, but she claimed that she brought her boyfriend, Dickerson, with her because she was worried that Gomez Rojas was going to try to have sex with her. She testified that after she and Gomez Rojas entered his apartment, he locked the door, which made her feel uncomfortable, so

---

2. The actual text messages between Reecy and Gomez Rojas were not introduced at trial.

she unlocked it. She further testified that Gomez Rojas then grabbed her by the arm and swung her around onto the couch and attempted to force her to perform oral sex on him. She claimed that she slipped away, and while she was on the floor, he forced himself on top of her and put his hands in her pants. She claimed that she tried to fight back by choking him, but he "smacked" her. She testified that she was screaming and putting her arms up to protect herself. She claimed that she grabbed a cellular phone that she noticed to her right side and struck Gomez Rojas on the head as hard as she could. She testified that Gomez Rojas screamed, and shortly after that, Dickerson opened the apartment door, and Gomez Rojas ran to the back of the apartment. She testified that she was then able to leave, and after doing so, she discarded the debit card.

[¶23.] Defense counsel entered pictures into evidence depicting bruises on Reecy's arms and neck and a scratch on her neck. The pictures were taken seven days after the incident. Reecy claimed that Gomez Rojas caused the injuries. She testified that she did not report the incident because she just wanted to forget about what had happened. She also claimed that she did not even tell Dickerson about what happened in the apartment.

[¶24.] The defense rested, and after closing arguments, the jury found both Dickerson and Reecy guilty of first-degree robbery with a dangerous weapon and first-degree burglary committed in the nighttime. The jury also found Dickerson guilty of aggravated assault under circumstances manifesting extreme indifference to human life. Having consolidated Dickerson's and Reecy's appeals, we restate their issues as follows:

1. Whether the circuit court erred in precluding evidence of Gomez Rojas's immigration status.

2. Whether the circuit court erred in admitting the printout of transactions related to Gomez Rojas's bank account.

3. Whether the circuit court erred in denying Dickerson's motion for judgment of acquittal.

## Analysis and Decision

### *1.     Whether the circuit court erred in precluding evidence of Gomez Rojas's immigration status.*

[¶25.]     Dickerson contends that the circuit court's decision to exclude the evidence of Gomez Rojas's immigration status "prevented the jury from receiving the full picture" of "his motivation to fabricate important details related to the charges." Dickerson further asserts that the circuit court improperly focused on the fact Gomez Rojas had not yet filed an application for a U-Visa. In his view, the timing of the application is irrelevant under the circumstances because Gomez Rojas testified that he would likely be applying for a U-Visa in the future. Dickerson argues that this evidence would have informed the jury that Gomez Rojas stood to benefit from "providing embellished testimony, thereby increasing the probability of a conviction." Finally, Dickerson asserts that his Sixth Amendment right to effectively cross-examine and confront Gomez Rojas trumps any potential prejudice that would result from admitting the evidence.

[¶26.]     Reecy similarly argues that the circuit court's exclusion of the evidence violated her Sixth Amendment right to confront and cross-examine Gomez Rojas. She claims that the partiality of a witness is always subject to exploration at trial. In her view, the circuit court's concern about a minitrial related to Gomez Rojas's

current immigration status, including what, if anything, he has applied for, "is overstated[.]" Reecy notes that Gomez Rojas admitted, during his testimony about his immigration status provided outside the presence of the jury, that he was in the United States illegally, and his testimony on this topic, in total, spans only six pages. Reecy also contends that in denying her the opportunity to cross-examine Gomez Rojas on this topic, the court effectively prevented her from presenting her defense theory, namely, that Gomez Rojas lied about the incident because he was concerned that a rape allegation, a deportable offense, would compromise his immigration status.

[¶27.]     "The Sixth Amendment to the United States Constitution provides that a criminal defendant has the right to be 'confronted with the witnesses against him.'" *State v. Carothers* (*Carothers I*), 2005 S.D. 16, ¶ 8, 692 N.W.2d 544, 546 (quoting U.S. Const. amend. VI). "This right is 'generally satisfied when the defense is given a full and fair opportunity to probe and expose [a witness'] infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony.'" *State v. Carothers* (*Carothers II*), 2006 S.D. 100, ¶ 16, 724 N.W.2d 610, 617 (quoting *United States v. Owens*, 484 U.S. 554, 558, 108 S. Ct. 838, 841, 98 L. Ed. 2d 951 (1988)).

[¶28.]     The United States Supreme Court has long recognized "that 'the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.'" *Olden v. Kentucky*, 488 U.S. 227, 231, 109 S. Ct. 480, 483, 102 L. Ed. 2d 513 (1988) (quoting *Davis v. Alaska*, 415 U.S. 308, 316–17, 94 S. Ct. 1105, 1110, 39 L. Ed. 2d 347 (1974)). But

"[i]t does not follow . . . that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness." *Delaware v. Van Arsdall*, 475 U.S. 673, 679, 106 S. Ct. 1431, 1435, 89 L. Ed. 2d 674 (1986). Therefore, a court may impose reasonable limits on defense counsel's cross-examination as to the potential bias of a prosecution witness to avoid such things as "harassment, prejudice, confusion of the issues . . . or interrogation that [would be] . . . only marginally relevant[.]" *Olden*, 488 U.S. at 232, 109 S. Ct. at 483 (quoting *Van Arsdall*, 475 U.S. at 679, 106 S. Ct. at 1435).

[¶29.] However, when a court cuts "off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violate[s] [a defendant's] rights secured by the Confrontation Clause." *Van Arsdall*, 475 U.S. at 679, 106 S. Ct. at 1435. Therefore, while we generally review evidentiary rulings for an abuse of discretion, the issue here concerns whether the circuit court's exclusion of all evidence related to the alleged victim's immigration status violated the defendants' Sixth Amendment right, and our review is de novo.[3] *See State v. Spaniol*, 2017 S.D. 20, ¶ 23, 895 N.W.2d 329, 338

---

3. A court's decision *limiting* cross-examination is an evidentiary ruling that "will be reversed only if there is both an abuse of discretion and a showing of prejudice to the defendant." *State v. Kryger*, 2018 S.D. 13, ¶ 13, 907 N.W.2d 800, 807. For example, in *Kryger*, the Court found no abuse of discretion in a circuit court's ruling limiting cross-examination of a murder victim's brother by precluding questions related to specific threats he made to kill the defendant. *Id.* ¶ 16, 907 N.W.2d at 808. Unlike the critical nature of Gomez Rojas's testimony here, the testimony of the witness in *Kryger* on direct

(continued . . .)

(reviewing de novo whether the circuit court's denial of an evidentiary motion violated defendant's Sixth Amendment right).

[¶30.]     We have not before examined whether or how a witness's immigration status or efforts to obtain a U-Visa may be admissible to show motive to testify in a certain manner.[4]  However, multiple other appellate courts have examined the issue and have concluded that a witness's immigration status is relevant and admissible when such evidence has the tendency to demonstrate the witness's bias or motive to fabricate.  While the facts of these cases are not all identical to those at issue here, the legal reasoning underlying the courts' rulings is persuasive.

[¶31.]     For example, in *Romero-Perez v. Commonwealth*, one of the alleged domestic assault victims had applied for a U-Visa, and during the trial, defense

---

(. . . continued)

examination was described as "narrow"; was limited to the investigative timeline after the victim's body was discovered; and was cumulative to other witnesses' testimony.  In affirming the evidentiary ruling, the Court noted that despite not being able to ask questions about specific threats, the defendant was permitted to cross-examine the brother about his ill bias against the defendant and his visceral reaction when he learned his sister had been killed.  *Id.*

4.     The dissent narrowly frames the issue as one relating to the exclusion of U-Visa evidence and then contends that exclusion of such evidence was proper because Gomez Rojas "was *not* aware of" the U-Visa program "when he told police that he had been assaulted and robbed by Reecy and Dickerson."  *See* Dissent ¶ 51.  Aside from the fact that the trial testimony from Gomez Rojas's neighbors was that they were the ones who decided to call the police and report the incident, there is no dispute that Gomez Rojas *was* aware at the time of the incident that he was in the United States illegally.  Moreover, as the dissent recognizes, Gomez Rojas sought the advice of an attorney because he was concerned with "his ability to remain in the United States."  *See id.* After learning of the U-Visa program, he became aware that his continuing participation in the prosecution and his testimony against Reecy and Dickerson could impact his immigration status.

counsel sought to use the evidence to support that she was biased, had a motive to fabricate, and an incentive to exaggerate her testimony at trial. 492 S.W.3d 902, 904 (Ky. Ct. App. 2016). The trial court excluded the evidence, citing concerns that the case would turn into an immigration trial and that permitting such cross-examination would defeat the purpose of such visas. The appellate court reversed, noting that "[i]n order for the jury to properly weigh the testimony of the witness, it is entitled to hear all of the evidence calculated to influence the witness' testimony." *Id.* at 905. It determined that "[t]he ability to transform oneself from illegal immigrant, to legal visa holder, to permanent legal resident in a relatively short amount of time without ever having to the [sic] leave the United States, *could* provide a strong motive for fabrication or embellishment." *Id.* at 907. Thus, the court concluded that "it is clear that there was a 'practical connection between the evidence sought to be introduced and the alleged implication of bias.'" *Id.* (citation omitted).

[¶32.] Similarly, in *State v. Valle*, the defendant sought to introduce evidence that the victim had applied for a U-Visa. 298 P.3d 1237, 1240 (Or. Ct. App. 2013). The trial court excluded the evidence, stating that "'none of us seem[] to understand it quite well enough to allow it in or out' and that 'the cause of the visa is speculative, at best.'" *Id.* The appellate court, however, explained that "[a]t the admissibility stage, the only question is whether a jury could find that the witness has a motive to testify in a certain manner. Whether the witness actually has a motive and, if so, whether the motive has influenced the witness's testimony, are separate and subsequent questions for the jury." *Id.* at 1243. The court rejected the

notion that there had to be "an established *quid pro quo*" before the witness could be cross-examined on this topic. *Id.* at 1245. Rather, it determined that the trial court erred in excluding the evidence because the jury could infer that the witness had a personal interest in testifying a certain way from the evidence that the victim had applied for an opportunity to stay in the United States on the basis that she had been a victim of a qualifying crime. *Id.* at 1243–44.

[¶33.] Outside the U-Visa context, other courts have also addressed the admissibility of evidence of a witness's immigration status if it suggests a motive to testify falsely to avoid deportation. A special court of appeals in Maryland reversed a trial court's exclusion of evidence of a witness's status as an illegal immigrant. *Carrero-Vasquez v. State*, 63 A.3d 647, 661 (Md. Ct. Spec. App. 2013). The defendant had borrowed the witness's vehicle and was pulled over for traffic offenses. While searching the vehicle incident to the defendant's arrest, officers found a loaded revolver in the center console, which was later determined to be stolen. The defendant was charged with possession of a regulated firearm and at trial, he sought to question the owner of the vehicle, who had denied owning the handgun, about her immigration status and whether she would be subject to deportation if she were convicted of possessing a stolen handgun. The trial court precluded admission of the evidence. *Id.* at 655.

[¶34.] On appeal, the Maryland court concluded that the lower court's ruling violated the defendant's right of confrontation. *Id.* at 657 (relying on *Davis*, 415 U.S. at 316–17, 94 S. Ct. at 1110 and *Olden*, 488 U.S. 227, 109 S. Ct. 480). In particular, the court noted the United States Supreme Court's holding in *Davis*

"rejecting the claim that the State's interest in securing the confidentiality of juvenile records outweighed Davis's constitutional right to confront his accuser," and its conclusion that "[w]hatever temporary embarrassment might result to [the witness] or his family by disclosure of his juvenile record . . . is outweighed by [Davis's] right to probe into the influence of possible bias in the testimony of a crucial identification witness." *Id.* (quoting *Davis*, 415 U.S. at 319, 94 S. Ct. at 1105). Noting "that the right of confrontation is the cornerstone of a fair trial[,]" the court ultimately held that the State's "desire to protect immigrant witnesses from intimidation and unfair prejudice[ ] is truly subordinate to appellant's right to confront the witnesses against him."[5] *Id.* at 659.

[¶35.] Under the circumstances of this case, we conclude that Dickerson and Reecy have a constitutional right to probe into the possible motives influencing Gomez Rojas's testimony, including not only the circumstances of the alleged

---

5. This Court's decision in *State v. Rough Surface*, 440 N.W.2d 746 (S.D. 1989), also supports a determination that Reecy and Dickerson were denied their right of confrontation. In *Rough Surface*, the defendant relied on *Davis* to argue that he had a constitutional right to cross-examine witnesses regarding their juvenile records to show "they were susceptible to acting out of fear or concern of possible jeopardy to their status." *Id.* at 752. This Court recognized that *Davis* involved a similar request to cross-examine a witness regarding his juvenile record to show "he had testified to protect his probationary status or to shift suspicion away from himself." *Id.* We noted the Supreme Court's conclusion that because the juvenile witness in *Davis* was crucial to the State's case, "the right of confrontation is paramount to the State's policy of protecting a juvenile offender." *Id.* (quoting *Davis*, 415 U.S. at 319, 94 S. Ct. at 1112). After determining that the juveniles in *Rough Surface* did not provide "the crucial link in the State's proof of the defendant's act[,]" this Court found no violation of the defendant's confrontation rights. *Id.* Here, the State advised the jury that the case boils down to whether the jury believes Gomez Rojas's testimony, thus making Reecy's and Dickerson's right of confrontation paramount.

assault, but also his denial of any forced sexual contact with Reecy during the incident. It is undisputed that Gomez Rojas is in the United States illegally and that rape is a deportable offense. It is further undisputed that one week after the incident he sought the advice of an immigration attorney and learned that he could be eligible to apply for a U-Visa in the future.[6]

[¶36.] Against the backdrop of the disparities in Gomez Rojas's initial description of the events in question and his evolving narrative after being confronted by law enforcement with the later discovered video and cellphone records, a jury could infer that his immigration status may have caused him to make a false report against Reecy to deflect a possible rape allegation by her. Also, although Gomez Rojas had not yet applied for a U-Visa, a jury could infer from his knowledge of the program and his indication that "if it comes to that point" he would "of course" apply for one, that he had an incentive to embellish or exaggerate his testimony against Dickerson and Reecy in order to be perceived as the victim in

---

6. The State directs this Court to two cases in which, like here, the witness had not yet applied for a U-Visa. *See State v. Buccheri-Bianca*, 312 P.3d 123 (Ariz. Ct. App. 2013); *People v. Chavez Limon*, 2019 WL 2635550 (Cal. Ct. App.). According to the State, these cases support the conclusion that Gomez Rojas's immigration status is not relevant to any issue at trial because he did not know about the U-Visa program until after he reported the crime and he was never promised anything in exchange for his cooperation. However, these cases are factually and procedurally distinguishable. *See, e.g.*, *Buccheri-Bianca*, 312 P.3d 123 (witness did not apply for a U-Visa until over a year after reporting the crime, there was no evidence that witness was in the country illegally, and defense counsel did not object on constitutional grounds); *Chavez Limon*, 2019 WL 2635550 (witness's request from prosecutor to assist in applying for a U-Visa was rejected; defendant was able to effectively impeach witness during trial using his prior convictions).

the events in question.[7]  This evidence was therefore relevant to whether Gomez

Rojas's version of the events was credible.  *See* SDCL 19-19-401 (providing that

"[e]vidence is relevant if: (a) It has *any tendency* to make a fact more or less

probable than it would be without the evidence; and (b) The fact is of consequence in

determining the action" (emphasis added)).

[¶37.]        It is also significant that Gomez Rojas was a critical witness.  Without

his testimony, the State could not have proven the elements of the charges at issue.

As the State told the jury, this case "comes down to one question: Who do you

believe?  Do you believe [Gomez Rojas]?  Do you believe Ms. Reecy?"  Yet the jury

---

7.    Like the State, the dissent also relies on two factually distinguishable
      decisions: *State v. Deleon-Yuja*, No. 2019AP2059-CR, 2021 WL 1883365, at *7
      (Wis. Ct. App. May 11, 2021) and *Ramos Pabon v. State*, No. 02-18-00517-CR,
      2019 WL 4122611, at *4 (Tex. App. Aug. 29, 2019).  In *Deleon-Yuja*, the
      victims who testified at trial were young girls, and unlike here, there was no
      evidence in the record that they or their parents "had an illegal immigration
      status."  2019 WL 4122611, at *7.  Further, this case did not involve a
      defense theory in which the witnesses at issue were accused of committing a
      crime, as was Gomez Rojas, and the prosecution's case did not rest solely on
      the credibility of their testimony.

      In *Ramos Pabon*, the victim, then seven years old, accused the defendant in
      2005 of sexually abusing her, but no charges were brought at that time.  2019
      WL 4122611, *2.  By the time charges were brought in 2016, the victim had
      obtained a U-Visa and permanent residency.  The trial court denied the
      defendant's attempt to introduce this evidence to show an ulterior motive to
      pursue her claim against him.  On appeal, the defendant raised a Sixth
      Amendment Confrontation Clause issue, but the appellate court found he had
      forfeited such a claim because he did not raise it below.  The court therefore
      reviewed the alleged error for an abuse of discretion and concluded that no
      such abuse occurred because at the time the case was reinvestigated and the
      defendant was arrested, the victim, who had obtained permanent residency
      in 2014, "was not subject to the U-Visa requirement that she cooperate with
      law enforcement or risk deportation[.]"  Notably, the appellate court
      remarked that "[t]he excluded evidence could certainly be admissible in a
      different factual scenario[.]"  *Id.* *4.

was not fully informed as to Gomez Rojas's potential motives in assessing his credibility. More importantly, the court's ruling prevented defense counsel from discrediting the State's explicit argument to the jury that Gomez Rojas "doesn't have anything at stake in this case" and "doesn't stand to gain or lose anything from the outcome of the case."

[¶38.] Contrary to the circuit court's ruling, allowing admission of the evidence here would not confuse the issues or require a minitrial as to his immigration status given Gomez Rojas's admissions. And even if Gomez Rojas would be prejudiced by the admission of this evidence, whether Gomez Rojas was lying about his encounter with Reecy and Dickerson goes to the heart of their defenses, and the State has not established that any danger of unfair prejudice substantially outweighs its probative value. *See* SDCL 19-19-403 (providing that relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence"). As one court explained, "Given the nature of the U-Visa program, . . . a criminal defendant's right to effectively probe into a matter directly bearing on witness credibility and bias must trump any prejudice that would result from the jury's knowledge of the victim's immigration status." *Romero-Perez*, 492 S.W.3d at 907.

[¶39.] This Court has observed that "the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." *State v. Packed*, 2007 S.D. 75, ¶ 23, 736 N.W.2d 851, 859

(quoting *Davis*, 415 U.S. at 316–17, 94 S. Ct. at 1110). Moreover, "[t]he right of cross-examination is more than a desirable rule of trial procedure. It is implicit in the constitutional right of confrontation, and helps assure the 'accuracy of the truth-determining process.'" *Chambers v. Mississippi*, 410 U.S. 284, 295, 93 S. Ct. 1038, 1046, 35 L. Ed. 2d 297 (1973) (quoting *Dutton v. Evans*, 400 U.S. 74, 89, 91 S. Ct. 210, 220, 27 L. Ed. 2d 213 (1970)). Because the evidence related to Gomez Rojas's immigration status was relevant given the circumstances in this case and the danger of unfair prejudice did not substantially outweigh its probative value, the circuit court's decision denying admission of the evidence deprived Dickerson and Reecy of their constitutional right to confrontation.

[¶40.]       "When a defendant has shown his constitutional right to confrontation has been violated, he is entitled to a new trial unless the [violation] constitutes harmless error." *State v. Taylor*, 2020 S.D. 48, ¶ 49, 948 N.W.2d 342, 356 (quoting *State v. Richmond*, 2019 S.D. 62, ¶ 35, 935 N.W.2d 792, 802); *see* SDCL 23A-44-14 (harmless error rule). "The State bears the burden of proving beyond a reasonable doubt the error was harmless." *State v. Johnson*, 2009 S.D. 67, ¶ 25, 771 N.W.2d 360, 370.

[¶41.]       In determining whether a violation of a defendant's constitutional right to confrontation is harmless, the relevant inquiry is "whether, assuming that the damaging potential of the cross-examination were fully realized, a reviewing court might nonetheless say that the error was harmless beyond a reasonable doubt." *Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438. *See also State v. Zakaria*, 2007 S.D. 27, ¶ 19, 730 N.W.2d 140, 146 (providing that we must be "able to declare

a belief beyond a reasonable doubt that the error was harmless and did not contribute to the verdict obtained" (citation omitted)). The Supreme Court has further explained that:

> Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include *the importance of the witness' testimony in the prosecution's case,* whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

*Van Arsdall*, 475 U.S. at 684, 106 S. Ct. at 1438 (emphasis added).

[¶42.]	In its appellate briefs, the State focuses only on whether the circuit court's exclusion of the immigration evidence was error and not whether, in the event this Court would determine that error occurred, the error was harmless. When asked during oral argument to explain on what basis the error could be considered harmless beyond a reasonable doubt, the State claimed that admission of the evidence concerning Gomez Rojas's immigration status would not have changed the jury's verdict in light of the evidence in the record supporting that Reecy and Dickerson entered Gomez Rojas's apartment, assaulted him, and robbed him. In the State's view, Reecy and Dickerson were able to ask questions challenging Gomez Rojas's credibility. In particular, the State noted that Gomez Rojas was asked questions about inconsistencies in his statements to law enforcement and his testimony at trial. The State further argued that given Reecy's testimony that

Gomez Rojas had raped her, the defense still had the opportunity to argue that Gomez Rojas had a motivation to lie to avoid being prosecuted for rape.[8]

[¶43.]        While the defense was not without other means to challenge Gomez Rojas's credibility, there is no doubt that Gomez Rojas's testimony was critical to the State's case.  In fact, during closing argument, counsel for the State informed the jury multiple times that the case boils down to one question—whether the jury believes Gomez Rojas.  Despite the significance of his testimony, Reecy and Dickerson were prevented from fully exposing Gomez Rojas's potential motives to lie and were unable to respond to the State's argument to the jury that Gomez Rojas "doesn't have anything at stake in this case" and "doesn't stand to gain or lose anything from the outcome of the case."  Finally, Gomez Rojas's testimony as to the key elements of the charges was not cumulative, and other than the next-door neighbors hearing screams, there was no evidence corroborating Gomez Rojas's version of what led up to him being injured inside his apartment on June 19, 2019.  The State's case against Dickerson and Reecy depended primarily on whether the jury believed the defendants' or Gomez Rojas's versions of what transpired in the

---

8.      The dissent also relies on Reecy's opportunity to argue that Gomez Rojas gave law enforcement a false account of what transpired in his apartment to avoid criminal liability for the alleged attempted rape. *See* Dissent ¶ 54.  In the dissent's view, because the attempted-rape defense was developed at trial, the circuit court did not prohibit all inquiry into the possibility that Gomez Rojas would be motivated to lie.  The dissent's argument subjectively discounts the notion that for some individuals, the long-term consequences of deportation would be equally, if not more, concerning than the possibility of a conviction and sentence for an attempted rape.

apartment.[9] Thus, the State has not established that the circuit court's error was harmless beyond a reasonable doubt. As a result, Dickerson and Reecy are entitled to a new trial.

> ### 2. *Whether the circuit court erred in admitting the printout of transactions related to Gomez Rojas's bank account.*

[¶44.] Dickerson and Reecy assert that the circuit court erred in applying the business records exception to the hearsay rule to allow admission of the printout of transactions purportedly from MetaBank. They note that the exhibit contains no symbols or other indicia that it was produced by MetaBank or any identifying information connecting the document to Gomez Rojas. They then claim that the court erred in simply relying on Gomez Rojas's representation that the document was produced by the bank. In its appellate briefing, the State only addresses whether Dickerson and Reecy were prejudiced by the admission of the evidence, essentially conceding an error in its admission.[10]

[¶45.] "Business records qualify for a hearsay exception if they are records of a regularly conducted business activity." *State v. Stokes*, 2017 S.D. 21, ¶ 13, 895 N.W.2d 351, 354. The exception requires that:

---

9. Any reliance by the State on the purported bank transaction record for Gomez Rojas's debit card, as corroborating evidence of an attempted theft to support the burglary charges, must be discounted given our determination in this appeal under issue two that these records were improperly admitted.

10. During oral argument, the State declined to concede that the circuit court erred in admitting the evidence. However, when asked, the State could not identify a basis on which the evidence would be admissible. Instead and similar to its response in its appellate briefing, the State only asserted a lack of prejudice.

(A) The record was made at or near the time by—or from information transmitted by—someone with knowledge;
(B) The record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
(C) Making the record was a regular practice of that activity;
(D) *All these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with a rule or a statute permitting certification*; and
(E) The opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

SDCL 19-19-803(6) (emphasis added).

[¶46.]        Here, the State did not lay an adequate foundation for the admission of the transaction document, and the circuit court erroneously determined that Gomez Rojas was a qualified witness as contemplated by the exception to the hearsay rule. Gomez Rojas did not claim to be familiar with MetaBank's recordkeeping practices or with how the transaction list was prepared. Even more problematic, he had no knowledge of the 19 transactions most pertinent to the charges at issue. Similarly, although Detective Vandervelde also testified about these records, he had no firsthand knowledge of the existence of the transactions or how the list was created and could only make assumptions about the date and time stamps on the document. "While '[t]he phrase "another qualified witness" is given a very broad interpretation,' the witness must nonetheless possess 'enough familiarity with the record-keeping system of the entity in question to explain how the record came into existence in the course of a regularly conducted activity of the entity.'" *Stokes*, 2017 S.D. 21, ¶ 16, 895 N.W.2d at 356 (citation omitted). Therefore, the circuit court

erred in admitting these bank records.[11]  If admission of the transaction document arises again on remand, the circuit court is directed to properly apply the business records exception prior to admitting such evidence.

[¶47.]         Reversed and remanded.[12]

[¶48.]         JENSEN, Chief Justice, and MYREN, Justice, concur.

[¶49.]         KERN and SALTER, Justices, dissent.


SALTER, Justice (dissenting).

[¶50.]         I believe that the exclusion of U-Visa evidence relating to a witness could, in some cases, result in a violation of a defendant's Sixth Amendment right of confrontation.  However, I do not believe this is such a case, and I write to respectfully note my dissent.

[¶51.]         As an initial matter, the U-Visa evidence sought for cross-examination here lacks logical relevance, and I would affirm the circuit court's decision to

---

11.    Because we are remanding both cases for a new trial, we need not examine whether this error was prejudicial.  *See, e.g.*, *Packed*, 2007 S.D. 75, ¶ 35, 736 N.W.2d at 862 (declining to address prejudice in light of remand).  However, it bears clarifying that contrary to the dissent's view that the bank records were admitted "simply to confirm that Gomez Rojas had not authorized certain debit card purchases[,]" *see* Dissent ¶ 55, the State admitted the bank records to prove the fact that transactions were attempted on Gomez Rojas's debit card at specific times and on specific dates after the incident in order to implicate Reecy and Dickerson as the ones attempting to use the card.  Also, the dissent's suggestion that Gomez Rojas's testimony could establish that transactions were attempted is simply incorrect because he lacked personal knowledge to render such testimony.  Further, his testimony relating what he was told by the bank was inadmissible hearsay.

12.    Given the disposition of the case, we also decline to consider whether the circuit court erred in denying Dickerson's motion for judgment of acquittal.

exclude it on that uncomplicated basis. The only evidence in the record relating to Gomez Rojas and the U-Visa program indicates that he was *not* aware of it when he told police that he had been assaulted and robbed by Reecy and Dickerson. Gomez Rojas learned of the U-Visa program a week after the November 19 incident when he asked an immigration attorney if assisting in the police investigation would *jeopardize*—not enhance—his ability to remain in the United States.

[¶52.] Other courts confronted with similar circumstances have upheld trial court decisions excluding U-Visa evidence where a witness was unaware of the program at the time the criminal behavior was initially reported. *See, e.g., State v. Deleon-Yuja*, No. 2019AP2059-CR, 2021 WL 1883365, at *7, *9 (Wis. Ct. App. May 11, 2021) (affirming trial court's exclusion of U-Visa evidence where it determined there was "nothing in the record [indicating] that the victims or their family knew about a U-[V]isa when the sexual assault disclosures were made"); *Ramos Pabon v. State*, No. 02-18-00517-CR, 2019 WL 4122611, at *4 (Tex. App. Aug. 29, 2019) (affirming the exclusion of U-Visa evidence where the defendant "did not offer any evidence" that "getting a U-Visa was on the . . . complainant's radar when she [reported] the sexual abuse").

[¶53.] But the fact-bound results in these cases, and the U-Visa cases cited by the Court, are more illustrative of established principles than reflective of new ones—a point the Court seems to overlook in its effort to explain the details of these non-binding decisions. There is nothing new or distinct about U-Visa information that differs from other types of evidence that could support an inference of bias and, yet, is properly excluded. *See Kryger*, 2018 S.D. 13, ¶ 15, 907 N.W.2d at 808

(affirming circuit court's decision prohibiting cross examination about a witness's threatening comments because, among other reasons, the threats occurred after the factual circumstances associated with the witness's testimony).

[¶54.]     I also do not believe the circuit court's decision to exclude the U-Visa evidence "prohibited *all* inquiry into the possibility" that Gomez Rojas would be motivated to lie as a means of diverting attention from an alleged effort to rape Reecy. *Van Arsdall*, 475 U.S. at 679, 106 S. Ct. at 1435. The defense theory that Gomez Rojas falsely reported the assault and robbery in a preemptive effort to avoid criminal liability for allegedly attempting to rape Reecy was probably a stronger basis for impeachment than the potential of simply being removed from the country. But, in any event, the attempted-rape defense theory was fully developed at trial, in part by cross examining Gomez Rojas.

[¶55.]     I do agree with the Court's conclusion that the circuit court abused its discretion by admitting the MetaBank document detailing Gomez Rojas's unauthorized debit card charges. However, the error was, in my view, harmless. *See State v. Brown*, 480 N.W.2d 761, 764 (S.D. 1992) (holding the erroneous admission of evidence under the business records exception "does not warrant reversal absent a showing that substantial rights of the party were affected"). The significance of the MetaBank transaction history was simply to confirm that Gomez Rojas had not authorized certain debit card purchases. His corresponding testimony established as much, without regard to the specific transactions themselves, and the bank information did not impact the jury's verdict.

[¶56.]     Finally, I am not persuaded by the defendants' arguments challenging the sufficiency of the evidence.  In my view, the jury's verdicts are supported by the evidence, and I would affirm the defendants' convictions in all respects.

[¶57.]     KERN, Justice, joins this dissent.