#27838-r-SLZ
2017 S.D. 21

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

NATHAN DALE STOKES,                       Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE DOUGLAS E. HOFFMAN
Judge

* * * *

MARTY J. JACKLEY
Attorney General

CAROLINE SRSTKA
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff
                                          and appellee.


BEAU J. BLOUIN of
Minnehaha County Public
Defender's Office
Sioux Falls, South Dakota                 Attorneys for defendant
                                          and appellant.

* * * *

CONSIDERED ON BRIEFS
FEBRUARY 13, 2017
OPINION FILED 05/03/17

#27838

ZINTER, Justice

[¶1.] Nathan Stokes appeals from convictions of simple assault and intentional damage to property. He argues that the trial court erred in admitting purported business records (a text-message log). We reverse and remand for a new trial.

## Facts and Procedural History

[¶2.] Nathan Stokes is the ex-boyfriend of Lyndsey Braunesreither. The two met on Facebook and became involved in an on-and-off relationship for roughly four years. Stokes lived with Braunesreither in Sioux Falls from January 2014 to August or September 2014. They then dated casually until June or July 2015. They broke up at the end of July 2015.

[¶3.] On August 13, 2015, Braunesreither returned home from work sometime after 8:20 p.m. and let her dogs outside. Braunesreither and her boyfriend at that time, Michael Blue, planned to meet at Braunesreither's home later that evening. Braunesreither's and Stokes's accounts of the rest of the evening sharply conflict.

[¶4.] According to Braunesreither, her doorbell rang around 8:53 p.m. She expected Blue but found Stokes standing at the door. She told Stokes he needed to leave, but Stokes said he would not until she spoke with him. Braunesreither responded that she was going to call the police. As Braunesreither went upstairs to get her phone, she could hear the garage side door being kicked in. Braunesreither retrieved pepper spray from her purse and went downstairs to get the dogs. At that point, Braunesreither found Stokes standing near her fireplace and she discharged

the pepper spray, hitting Stokes in the face. Stokes responded by throwing Braunesreither to the ground, wresting the pepper spray from her, and spraying her. Braunesreither then kicked Stokes, grabbed a bar stool from the kitchen to keep Stokes at a distance, and attempted to leave through the front door. However, Stokes blocked her, holding the door closed. Stokes told Braunesreither to go downstairs. Braunesreither then promised that she would not call the police if Stokes just left. Stokes ultimately left and she could hear car "wheels peel out" as he departed.

[¶5.] Braunesreither then locked the front door, rinsed her eyes out, and called the police at 9:05 p.m. Two officers responded. Upon arrival, the officers confirmed that pepper spray or some sort of chemical irritant had been used inside the house. They also observed the bar stool on the floor. One officer further observed that the door leading to the garage had a split locking mechanism and a boot mark in the middle with scrapes and marks consistent with it being kicked in. Stokes could not be located by the police at that time.

[¶6.] Stokes's version of that night was quite different. He denied being at Braunesreither's residence at the time alleged. Stokes claimed that he was at home, sick with the flu and texting friends. More specifically, he claimed that he was sick with the flu during the week of August 10, that he did not go into work on August 12, and that he was sent home after his first morning break on August 13. Stokes claimed that he spent the remainder of that day and evening at home napping and texting his friends Abbey and Rachel.

[¶7.]     Stokes was indicted on two counts of burglary in the first degree; three counts of simple assault; one count of false imprisonment; and one count of intentional damage to property.  A part II information alleged that Stokes had been convicted of three prior felonies.  An amended part II information alleged that he had been convicted of two prior assaults within the last ten years.

[¶8.]     During cross-examination of Stokes at trial, the State offered Exhibit 14 "as a self-authenticating business record."  Exhibit 14 purported to be Verizon's log of Stokes's text messages sent and received on August 13, 2015, between 8:50 p.m. and 9:59 p.m., encompassing the time that Braunesreither alleged Stokes was inside her home.  The exhibit showed no texting on Stokes's phone during the time of the alleged crime.  The exhibit was offered to rebut Stokes's claim that he was at home texting Abbey and Rachel.  Stokes objected to the exhibit for lack of foundation.

[¶9.]     At that point the State attempted to establish a foundation through Stokes.  The State asked him whether Verizon was his cellular-phone carrier; if his phone number was the one listed in Exhibit 14 as sending and receiving text messages; whether one of the phone numbers listed on the log was Rachel's; and whether he had received a text message from Rachel at 8:50 p.m.  Stokes responded that Verizon was his carrier, and that the number listed was his.  However, he could not recall what Rachel's phone number was or if he had received a text message from her at that time.  The State then asked Stokes if he remembered receiving a text message at 8:50 p.m. "from someone," and Stokes replied that he did remember.  So the State then asked if Stokes thought the records were incorrect

if they indicated that he received a text message at 8:50 p.m. Stokes replied that he did not think they would be incorrect. The State then pointed out that the phone records did not indicate a reply message was sent to that text message until 9:22 p.m., and the State again asked Stokes if he believed the record to be inaccurate. Stokes responded that he did not believe it was inaccurate. He did not, however, admit that Exhibit 14 was what it was purported to be: a Verizon record of all of his text messages made and received from his phone during the time in question.

[¶10.] Stokes reasserted his foundation objection after this showing, and the trial court took the offer under advisement. The court later overruled Stokes's objection, stating that the cell phone records were not "testimonial" in nature, which suggested that there may have been some concern about a hearsay–confrontation question. *See generally Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Stokes, however, renewed his business-record-foundation objection, arguing that the State failed to introduce a witness who could testify that the log was "kept in the normal course of business records or anything along those lines." The court overruled the objection and admitted the records, ruling that the records were admissible based on "a combination of the inherent reliability of cell phone records as being his or her records of his or her own cell phone are characterized by [an] inherent guarantee of trustworthiness."

[¶11.] Stokes was found guilty of misdemeanor simple assault (count 5 alleging assault by physical menace) and misdemeanor intentional damage to property (count 7 alleging damage to Braunesreither's garage side door). The jury acquitted on the remaining charges involving conduct allegedly occurring inside the

home: assault (counts 3 and 4 alleging an attempt to cause and recklessly causing bodily injury to Braunesreither), burglary (counts 1 and 2 alleging entry or remaining in the home), and false imprisonment (count 6 alleging the actual restraint of Braunesreither). Pursuant to the part II information, Stokes was sentenced to two years in the penitentiary with credit for time served. He appeals, contending that the circuit court erred in admitting the cellular-phone records.[1]

*Decision*

[¶12.] We review evidentiary rulings under the abuse of discretion standard. *State v. Martin*, 2015 S.D. 2, ¶ 7, 859 N.W.2d 600, 603. Additionally, "evidentiary rulings made by the trial court are presumed correct[.]" *State v. Berget*, 2014 S.D. 61, ¶ 13, 853 N.W.2d 45, 51-52. However, "admission of evidence in violation of a rule of evidence is an error of law that constitutes an abuse of discretion[.]" *Johnson v. O'Farrell*, 2010 S.D. 68, ¶ 12, 787 N.W.2d 307, 312.

[¶13.] Exhibit 14 purports to be Verizon's record of all of Stokes's cellular-phone activity at the exact time the crimes were alleged to have occurred. Business records qualify for a hearsay exception if they are records of a regularly conducted business activity. The exception requires that:

> (A)  The record was made at or near the time by—or from information transmitted by—someone with knowledge;
>
> (B)  The record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;

---

1.  Stokes also contends that the circuit court abused its discretion in failing to admonish the jury to not speculate on the answer to a withdrawn question regarding limitations on Stokes's visitation with his children. Because we are remanding for a new trial, we do not reach this question.

(C)     Making the record was a regular practice of that activity;

(D)     *All these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with a rule or a statute permitting certification*; and

(E)     The opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

SDCL 19-19-803(6)(A)-(E) (emphasis added).  Thus, foundation for admissibility requires the "testimony of the custodian or [an]other qualified witness" that the records have been prepared and kept in the course of a regularly conducted business activity.  *DuBray v. S.D. Dep't of Soc. Servs.*, 2004 S.D. 130, ¶ 15, 690 N.W.2d 657, 662-63 (quoting SDCL 19-16-10 (transferred to SDCL 19-19-803(6)(D)).  Alternatively, that foundation may be laid by a written certification of those conditions made in compliance "with a rule or a statute permitting certification[.]" SDCL 19-19-803(6)(D).

[¶14.]     SDCL 19-19-902(11) is a rule permitting certification of the foundational requirements for admission of domestic records of any regularly conducted activity.  To provide the necessary foundation for admission of business records, the certification must "meet[] the requirements of [SDCL] 19-19-803(6)(A) [to] (C) as shown by a certification of the custodian or another qualified person[.]" SDCL 19-19-902(11).  "In other words, Rule 902(11) extends Rule 803(6) 'by allowing a written foundation [for a business record] in lieu of an oral one.'"  5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 902.13[1], at 902-37 (Mark S. Brodin ed., 2d ed. rel. 114-11/2015) (quoting *United States v. Adefehinti*, 510 F.3d 319, 327-328 (D.C. Cir. 2007)).  Ultimately, whether by testimony under SDCL 19-19-803(6)(D) or certification under SDCL 19-19-902(11),

foundation must be laid by the custodian or another qualified person. The custodian or other qualified person must show that the record was made at or near the time of the recorded act, event, condition, opinion, or diagnosis by—or from information transmitted by—someone with knowledge; that the record was kept in the course of a regularly conducted activity of the business; and that making the record was a regular practice of that activity. SDCL 19-19-803(6)(A) to (C).

[¶15.]	Here, Exhibit 14 was hearsay, and it was admitted over objection and without testimony or certification of the foregoing foundational requirements for the hearsay exception that is available for business records. As Stokes correctly observes, there was no testimony or certificate explaining how and when the data was generated. Thus, there was no foundation for the hearsay exception permitted under SDCL 19-19-803(6).

[¶16.]	The State responds to this foundational deficiency, arguing that Stokes "authenticated" the record generated by his cell phone during his cross-examination. Stokes, however, only made limited admissions regarding certain entries on the exhibit. He offered no testimony regarding the business activity that created what was purported to be a Verizon log of all messages sent and received during the time of the alleged offense. "[A] proper foundation consists of testimony 'that a document has been prepared and kept in the course of a regularly-conducted business activity.'" *DuBray*, 2004 S.D. 130, ¶ 15, 690 N.W.2d at 662 (quoting *State v. Brown*, 480 N.W.2d 761, 763 (S.D. 1992)). But Stokes was not a custodian of the record or "other qualified witness" who could provide that foundation for the log. *See* SDCL 19-19-803(6)(D). While "[t]he phrase 'another qualified witness' is given

a very broad interpretation," the witness must nonetheless possess "enough familiarity with the record-keeping system of the entity in question to explain how the record came into existence in the course of a regularly conducted activity of the entity." 5 Weinstein, *supra* ¶ 14, § 803.08[8][a], at 803-83 to -86.

[¶17.]     Notwithstanding this foundational deficiency, the State contends that Exhibit 14 was admissible because it was "authenticated" under SDCL 19-19-901(b)(1) and 901(b)(6). SDCL 19-19-901(b) offers a non-exhaustive list of examples satisfying the general authentication requirement that an "item is what the proponent claims it is." *See* SDCL 19-19-901(a). SDCL 19-19-901(b)'s examples include:

> (1)     Testimony of a witness with knowledge. Testimony that an item is what it is claimed to be.
>
> . . .
>
> (6)     Evidence about a telephone conversation. For a telephone conversation, evidence that a call was made to the number assigned at the time to:
>
>> (A)     A particular person, if circumstances, including self-identification, show that the person answering was the one called . . . .

SDCL 19-19-901(b)(1), -(6)(A). The State notes that Stokes "identified his phone number, which was the same target phone number listed on Exhibit 14's text message logs. [Stokes] also testified that his cell phone carrier is Straight Talk, which is part of Verizon Wireless." According to the State, this evidence satisfied the authentication rules' requirements.

[¶18.]     The State's reliance on the authentication rules in SDCL 19-19-901(b)(1) and (b)(6) is misplaced because it is based on the erroneous premise that *authentication* of a document satisfies the *foundational* requirements

necessary to qualify for a hearsay exception. Authenticating an item of evidence only concerns the production of "evidence sufficient to support a finding that the item is what the proponent claims it is." SDCL 19-19-901(a). SDCL 19-19-803(6)(D), however, requires more. It sets forth additional foundational requirements to qualify a business record under the business-records hearsay exception. As previously noted, to qualify for the hearsay exception, the proponent must produce foundational testimony or certification required for business records. Because the hearsay rules require this additional foundational showing, a proponent seeking admission must not only authenticate in accordance with SDCL 19-19-901 (show that the exhibit is a record of what the proponent claims it is), but also lay the foundation required in SDCL 19-19-803(6) (show that the exhibit was kept and prepared in the course of a regularly conducted business activity). *See Zafer Taahhut Insaat ve Ticaret A.S. v. United States*, 833 F.3d 1356, 1365 (Fed. Cir. 2016) (holding "[a]uthentication and hearsay are two separate requirements" that cannot be conflated).

[¶19.]          Thus, authentication that Exhibit 14 was a copy of Stokes's cell-phone log under SDCL 19-19-901 did not substitute for the required showing that the log was also kept and prepared in the ordinary course of a regularly conducted business activity. Because the State did not lay the required foundation for Exhibit 14's admission under the hearsay exception, the circuit court erred as a matter of law in admitting the exhibit.[2]

---

2.      We also note that Stokes's cross-examination was not sufficient to either "authenticate" the business record as required by SDCL 19-19-901(a) or, as

(continued . . .)

[¶20.] The remaining question is whether the error prejudiced Stokes. An error in admitting evidence under SDCL 19-19-803(6) "does not warrant reversal absent a showing that substantial rights of the party were affected." *Brown*, 480 N.W.2d at 764. This requires a showing that the error must have "in all probability" affected the jury's decision. *Martin*, 2015 S.D. 2, ¶ 7, 859 N.W.2d at 603.

[¶21.] Stokes argues that Exhibit 14 affected the jury's decision because "the cell phone records were a significant piece of evidence in a closely contested case." Stokes points out that the case required a resolution of a credibility dispute between Stokes and Braunesreither concerning his presence at her home at the time she claimed: his defense was that he was home texting at that time, and the exhibit negated his claim. The State, however, contends that Exhibit 14's admission did

---

(. . . continued)

the circuit court apparently ruled, satisfy the hearsay rule because the exhibit was inherently reliable and trustworthy. *See* SDCL 19-19-807 (granting a hearsay exception for statements that have "equivalent circumstantial guarantees of trustworthiness"). Exhibit 14 was offered to rebut Stokes's defense that he was at home texting at the time of the alleged crimes. The exhibit rebutted that defense only because it purported to be a log of *all* Stokes's text messages, and according to the exhibit, there was no text message activity during the relevant times. But Stokes did not admit in his cross-examination that Exhibit 14 was a complete Verizon record of all his cellular-phone messages for the time in question. He only made concessions regarding his cell carrier and two numbers on the exhibit. Moreover, the "text log" is on the last page of the exhibit, and that page contains nothing but a list of numbers and times with no reference to Verizon. Thus, with respect to authentication, Stokes did not concede that the record "was what the proponent claims it [was]." *See* SDCL 19-19-901(a). And with respect to hearsay, the exhibit was not facially admissible as a matter of law under the residual hearsay exception in SDCL 19-19-807. The State has not argued that the other procedural and substantive requirements for the Rule 807 residual hearsay exception were satisfied.

not affect the jury's verdict because Exhibit 14 was merely cumulative. The State argues that its other evidence—Braunesreither's testimony and the physical evidence—was sufficient to convict.

[¶22.]     The State's reliance on the other evidence is misplaced. Braunesreither's credibility was the central issue in the case, and the physical evidence did not corroborate Braunesreither's testimony regarding the identity of the perpetrator. The physical evidence included photographs depicting damage to the garage door, pepper spray residue, the barstool, and Braunesreither's injuries. That evidence did tend to prove that there was an assailant, but not that it was Stokes.

[¶23.]     The ultimate issue for the jury was whether Stokes was at home texting or whether he was at Braunesreither's home engaging in all of the acts she alleged. Stokes correctly points out that although he testified that he was at home texting at the time alleged, the cell-phone log "leaves open a period of time between 8:50 p.m. and 9:22 p.m. during which Stokes [was not texting and] may have been at least present outside Braunesreither's home and exhibiting threatening behavior." That period of time was significant because although the jury apparently disbelieved Braunesreither and acquitted on the five charges involving the later, more extensive acts in the home, it convicted on the two charges involving the initial, brief activity outside the home. Further, the State concedes in its brief that Exhibit 14 "had a tendency to make the fact that [Stokes] was home sick texting all night less probable." For these reasons, we agree there is a reasonable probability that admission of the cell-phone log contributed to the jury's decision. Because the

evidentiary error was prejudicial, we reverse and remand for a new trial on counts 5 and 7.

[¶24.]    GILBERTSON, Chief Justice, and SEVERSON, WILBUR, and KERN, Justices, concur.