#30569-a-SPM
**2025 S.D. 13**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

LYDELLE EDMOND TURNER,                    Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JON C. SOGN
Judge

* * * *

JOSEY M. BLARE of
Lynn, Jackson, Shultz
   & Lebrun, P.C.
Sioux Falls, South Dakota                    Attorneys for defendant
                                             and appellant.


MARTY J. JACKLEY
Attorney General

JACOB R. DEMPSEY
Assistant Attorney General
Pierre, South Dakota                         Attorneys for plaintiff
                                             and appellee.

* * * *

ARGUED
OCTOBER 2, 2024
OPINION FILED **03/05/25**

#30569

MYREN, Justice

[¶1.]    Lydelle Turner was indicted on multiple counts following a drive-by shooting in Sioux Falls.  Throughout the proceedings, he filed several motions, including a motion to suppress, a motion to dismiss, a motion for judgment of acquittal, and a motion for a new trial.  The circuit court denied each of these requests.  Turner objected to the introduction of a screenshot photograph of a traffic camera video; the circuit court overruled this objection.  At the end of the trial, the circuit court rejected three jury instructions proposed by Turner.  Turner now appeals the circuit court's denial of each of those motions, the admission of the photograph, and the denial of his proposed jury instructions.  We affirm.

### Factual and Procedural Background

[¶2.]    On the morning of July 30, 2022, a group of people gathered outside a liquor store in Sioux Falls.  One of them noticed a vehicle approaching and asked, "Who is that?"  James Driver responded, "That's the guy that stay[s] across the street from your mom."

[¶3.]    Gunfire erupted from the vehicle, hitting one person in the leg and causing the others to scatter.  They began reemerging after the vehicle drove away.  Driver warned the group when he noticed that the vehicle was returning.  Gunfire showered the group a second time before the vehicle drove away.

[¶4.]    Theresa Walters, who lives near the scene of the shooting, observed the shooting and called law enforcement.  She explained that the shooter's vehicle was "a gold, like, suburban-type Tahoe or whatever."  Walters also reported the vehicle's

license plate number. Dispatch alerted law enforcement of Walters' description of the vehicle and the area where the shooting occurred.

[¶5.] When law enforcement arrived on the scene, they provided medical assistance to the injured group member and began investigating the scene. They interviewed witnesses and noticed spent .22 caliber and 9mm ammunition in the street. Walters told them the shooter was a black male and that he lived in the area. Driver described the shooter as having "a beard, a little afro" and "being maybe just a little darker than me." Driver said he recognized the vehicle because he had one like it and he had seen the shooter driving it before. The officers also used their cell phones to record videos of security camera footage of the shooting from the barbershop across the street and a residence in the area.

[¶6.] Meanwhile, another officer patrolling the area noticed a vehicle traveling at a high rate of speed that matched Walters' description of the vehicle from the shooting. The officer initiated a stop when the vehicle pulled into a gas station. Turner was the driver of the vehicle. Officers searched Turner and found two unspent .22 caliber cartridges in his pocket. In the vehicle, they found a spent .22 caliber cartridge casing on the driver's side floorboard and a number of unused .22 caliber and 9mm cartridges elsewhere in the vehicle. Before Turner was taken into custody, Driver was brought to the scene of the stop for a show-up identification.

[¶7.] On the way to the location of the stop, the transporting officer told Driver, "They found him." When Driver arrived, Turner's vehicle was surrounded by law enforcement vehicles. The first time Driver saw Turner at the scene, Turner

was in handcuffs, and Driver said "[t]hat ain't him. That ain't him. He had an afro." Driver asked if there was a hat in the vehicle. Continuing to observe Turner from a distance, Driver then uttered, "Yup, that's him." After that, another officer confirmed that there was a black hat in the vehicle. Driver then said, "Yeah, that's him. He took the hat off."

[¶8.] As part of their investigation, law enforcement officers reviewed and obtained security camera footage recorded shortly after the shooting from a residence near Turner's home. It showed Turner driving to his house, honking his horn, running in his driveway, squatting down, and then returning to the Yukon before driving away. After Turner left, a woman came out of the house, picked up something from the driveway, and went back inside. Law enforcement also reviewed Milestone camera footage[1] recorded about a minute before the shooting in the area where it occurred. The video showed Turner in the Yukon driving towards the location of the shooting. An officer took a "screenshot" of this video and later printed that photo.

[¶9.] The .22 caliber cartridges and spent casings found at the scene of the shooting and in Turner's vehicle were submitted to the state forensic lab for analysis by firearms expert Frans Maritz. In his report, he concluded that the spent cartridges recovered at the scene of the shooting and those from Turner's vehicle were fired from the same gun.

---

1. Milestone cameras are colloquially referred to as "traffic cameras." They are placed in various places in Sioux Falls and certain law enforcement personnel have access to these cameras to assist in investigations.

[¶10.]      After being taken into custody, Turner was interviewed by Detective Ian Branch.  Turner initially denied being in the area of the shooting.  When confronted with the Milestone photograph, Turner admitted he was in the area but claimed he was driving to the store.  Turner confirmed that he was the only person in the Yukon that morning.  He denied shooting anyone or owning any firearms.  When asked why he had ammunition in his pocket, Turner explained that he was shooting the previous evening.

[¶11.]      Relevant to this appeal, a grand jury indicted Turner with aggravated assault with a dangerous weapon, aggravated assault by physical menace with a dangerous weapon, and four counts of discharge of a firearm in violation of SDCL 22-14-20.  The State filed a part II information alleging Turner was a habitual offender with three prior felony convictions.

[¶12.]      Turner filed a motion to suppress Driver's identification of him, contending the procedure was impermissibly suggestive.  At a hearing on the motion, Officer Alexander Ivancevic testified and described how the identification occurred.  He explained that the show-up occurred "[a]pproximately a half hour" after the shooting and described Driver as "[c]onfident" in his identification.  Driver testified that the shooter's vehicle initially caught his eye because he had one like it.  Driver explained that he was familiar with Turner's vehicle; he had seen it many times because his fiancé's cousin lived on the same street as Turner.  He testified that there was only one person in the vehicle at the time of the shooting.

[¶13.]      The circuit court issued a memorandum decision denying the motion to suppress.  Although the circuit court concluded the identification procedure "was

unduly suggestive," it decided Driver's identification was still reliable, applying the factors from *Neil v. Biggers*, 409 U.S. 188, 199, 93 S. Ct. 375, 382, 34 L. Ed. 2d 401 (1972).

[¶14.]    Turner also filed two discovery requests. Although many items were requested, one request is particularly pertinent here:

> To permit the Defendant to inspect and copy any results or reports of scientific tests or experiments, or copies thereof, which are within the possession, custody or control of the State, the existence of which is known, or by the exercise of due diligence may become known to the State, and which are intended for the use by the State as evidence at the trial.

The circuit court granted these requests without objection from the State.

[¶15.]    The trial date was set for August 18, 2023. In an email exchange between defense counsel and the State between August 7–8, 2023, the State explained that it intended to introduce Maritz's ballistic report and his testimony at trial. Defense counsel responded that it had not seen this report and that it should not be introduced. Defense counsel then filed a motion to dismiss for violation of SDCL chapter 23A-13[2] or the exclusion of Maritz's report and his testimony. The circuit court quickly held a hearing on the matter. At the hearing, defense counsel argued the case should be dismissed with prejudice because it had requested documents such as the Maritz report before it was authored,[3] and the State's disclosure was untimely. The State responded that it was under the impression that the defense counsel had already received a copy of the report because the

---

2.    SDCL chapter 23A-13 addresses discovery in criminal matters.

3.    The State received the Maritz report in March 2023.

defense counsel had obtained its own ballistics expert. The State argued that dismissal was not appropriate because the State did not intentionally withhold the report.

[¶16.] At the end of the hearing, the circuit court explained that it did not "believe there [was] any bad faith involved in any of this. It's just an honest mistake" on the part of the State. The circuit court gave Turner two options: "Either the testimony comes in and we don't delay trial, or we delay trial and give you the chance to see what you want to do as far as [the defense's] expert is concerned." Turner opted to delay the trial. The trial was then continued for approximately a month.

[¶17.] After the trial was continued, Detective Logan Gooch recorded an interview with Arely Flores. Flores was parked outside of the barbershop across the street from where the shooting occurred. Flores said she observed three people in the suspect vehicle when the shooting happened. Detective Gooch prepared a report reflecting Flores' comments during the interview, and the State informed the defense that it intended to introduce Flores' testimony at trial.

[¶18.] The State called Flores as a witness at trial.[4] The State asked Flores, "how many people did you see in that vehicle?" She responded, "I didn't see how many people were in the vehicle." Turner focused his cross-examination on the discrepancy between her recorded interview and her answers during direct examination. After playing a portion of the recorded interview, Turner asked:

---

4.    Flores testified through a Spanish interpreter.

> DEFENSE: Did you hear the portion where you say how many individuals were in the vehicle?
>
> FLORES: Yes. What I saw were three individuals that were going to that place.
>
> DEFENSE: But you told Detective Gooch you saw three individuals in the vehicle driving by, didn't you?
>
> FLORES: I was mistaken. I didn't see any that were inside the vehicle.

In addition to this exchange during cross-examination, Turner also called Alejandra Hight, a legal assistant who assisted in two pretrial interviews of Flores conducted by the defense.[5] Hight testified that during the interviews, Flores explained that she witnessed an individual in the backseat of the suspect vehicle pick up a gun and begin shooting at the crowd.

[¶19.] During the trial, Turner filed a motion in limine requesting an order prohibiting the State from introducing the Milestone photograph of Turner in his vehicle. Turner argued that it was not admissible because the State did not disclose the photograph before the trial. Turner also argued that Detective Gooch could not lay the foundation necessary to admit the photograph because he was not the person who printed it. Finally, Turner argued that even if Detective Gooch could lay a sufficient foundation for the photograph to be authenticated, it could still not be admitted because the date and time stamps on the photograph were hearsay.

[¶20.] The State responded that it had not intended to introduce the photograph, but the redaction of another piece of evidence made the offer

---

5. Hight interpreted defense counsel's questions and Flores' answers during the interviews.

necessary.[6] The State explained that although the photograph was not listed on an exhibit list, Turner had possession of the photograph for roughly a month. With regards to foundation, the State argued that although Detective Gooch did not print the photograph himself, he was in the room when it was printed and had knowledge of the Milestone system. Finally, the State argued that the date and time stamps on the photograph were admissible under the business records exception to the hearsay rule. The circuit court concluded that Turner would suffer no prejudice from the introduction of the photograph, that Detective Gooch could establish sufficient foundation, and that the photograph was admissible under the business records exception.

[¶21.] At the close of the State's case-in-chief, Turner made a motion for judgment of acquittal on the counts alleging discharge of a firearm in violation of SDCL 22-14-20. The thrust of Turner's motion was that SDCL 22-14-20 required the State to prove that the vehicles were occupied at the time of the shooting. The circuit court disagreed with that interpretation of that statute and denied the motion.

[¶22.] At the conclusion of the trial, Turner proposed instruction 101, which tracked his interpretation of SDCL 22-14-20. The circuit court denied that proposed instruction because it concluded the instruction was based on an incorrect

---

6. The redacted piece of evidence was a recording of an interview by Detective Branch. Detective Branch used the photograph during the interview. However, in pretrial proceedings the circuit court determined that portions of the video were inadmissible hearsay. The video was edited to remove those portions. The discussion involving the photograph occurred during one of the redacted portions of the interview.

interpretation of that statute. Turner's proposed instruction 109 addressed witness identifications and, in part, read: "You must be satisfied beyond a reasonable doubt of the accuracy of the identification of the defendant before you may convict." Turner's proposed instruction 110 addressed the accuracy of witness identifications. The circuit court denied these instructions because it "believe[d] those issues [were] adequately covered in the other jury instructions."

[¶23.]     The jury convicted Turner on two counts of aggravated assault and four counts of discharge of a firearm in violation of SDCL 22-14-20. The State dismissed the part II information. Turner filed a motion for a new trial, arguing that the State had elicited false testimony from Flores and that the State's failure to produce the Milestone video, as opposed to the "screenshot" photograph, was a violation of the rule set out in *Brady v. Maryland*, 373 U.S. 83, 87, 83 S. Ct. 1194, 1196, 10 L. Ed. 2d 215 (1963). The circuit court denied this motion. The Milestone video had apparently not been saved and no longer existed, prompting the court to conclude that "[w]hile . . . it would be better if the traffic camera video had been saved, the Court finds that there is not a reasonable probability that had the video been saved and disclosed to the defense the result of the proceeding would have been different." Regarding Flores' testimony, the circuit court determined that "[i]n many ways Flores' testimony was consistent with what she told Gooch." The circuit court concluded that Turner suffered no prejudice because Flores was not under oath when Detective Gooch interviewed her, Turner had an opportunity to cross-examine Flores, and Turner called his own witness to impeach Flores.

[¶24.]    Turner now appeals, challenging (1) the denial of the motion to suppress Driver's identification; (2) the denial of the motion to dismiss based on the late disclosure of the Maritz report; (3) the introduction of the Milestone photograph; (4) the denial of the motion for judgment of acquittal based on Turner's interpretation of SDCL 22-14-20; (5) the denial of Turner's proposed jury instructions; and (6) the denial of the motion for a new trial.

**Decision**

### 1.    *Whether the circuit court erred in denying Turner's motion to suppress Driver's identification.*

[¶25.]    "We review 'the denial of a motion to suppress based on the alleged violation of a constitutionally protected right as a question of law by applying the de novo standard of review.'" *State v. Osman*, 2024 S.D. 15, ¶ 22, 4 N.W.3d 558, 565–66 (quoting *State v. Red Cloud*, 2022 S.D. 17, ¶ 21, 972 N.W.2d 517, 525). "We review the court's findings of fact under the clearly erroneous standard. Once the facts have been determined, however, the application of a legal standard to those facts is a question of law reviewed de novo." *State v. Schumacher*, 2021 S.D. 16, ¶ 19, 956 N.W.2d 427, 432 (citation omitted).

[¶26.]    This Court applies "a two-step inquiry to determine whether to suppress an identification." *Osman*, 2024 S.D. 15, ¶ 24, 4 N.W.3d at 566. "First, we examine whether 'the identification procedure is both suggestive and unnecessary[.]'" *Id.* (alteration in original) (citation omitted). A suggestive identification procedure produces "a very substantial likelihood of irreparable misidentification." *Neil*, 409 U.S. at 198, 93 S. Ct. at 381 (citation omitted). Whether an identification procedure is necessary is highly dependent on context.

-10-

*See Osman*, 2024 S.D. 15, ¶¶ 28–33, 4 N.W.3d at 567–69. "The policy underlying [these rules] is to 'deter law enforcement use of improper lineups, showups, and photo arrays in the first place.'" *Red Cloud*, 2022 S.D. 17, ¶ 22, 972 N.W.2d at 526 (citation omitted).

[¶27.]     Second, "[i]f the identification procedure is found to be both suggestive and unnecessary, we then analyze the reliability of the identification." *Osman*, 2024 S.D. 15, ¶ 24, 4 N.W.3d at 566 (citation omitted). To assess reliability, the following factors are considered:

> [T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation.

*Red Cloud*, 2022 S.D. 17, ¶ 23, 972 N.W.2d at 526 (alteration in original) (citation omitted). "If these factors show that the reliability of the identification outweighs the suggestive procedure used, the identification should be admitted." *Id.*

[¶28.]     The type of identification procedure used in this case was a show-up identification and was "inherently suspect[,]" as "[t]he practice of showing suspects singly to persons for purposes of identification has been consistently condemned as an affront to the requirements of due process and good police procedure." *Red Cloud*, 2022 S.D. 17, ¶ 22, 972 N.W.2d at 526 (second alteration in original) (citation omitted).

[¶29.]     The show-up identification in this case was suggestive. While law enforcement was transporting Driver to the scene of the stop, an officer informed him, "They found him." Thus, before Driver arrived at the scene, he had been told

that the person he was going to see was the perpetrator. Upon arriving at the scene, Turner's vehicle was surrounded by police cars. Turner was in handcuffs and surrounded by law enforcement officers. As in *Red Cloud*, the circumstances of this identification produced a "substantial likelihood of irreparable misidentification." *Neil*, 409 U.S. at 198, 93 S. Ct. at 381.

[¶30.]     Although the identification procedure was suggestive, we conclude that it was necessary under the circumstances. We have previously held that identifications that occur "within a reasonably short time after commission of the alleged offense" can be necessary. *State v. Clabaugh*, 346 N.W.2d 448, 451 (S.D. 1984). "If the wrong man was apprehended, the suspect can be freed and the police can continue their search; if the suspect is positively identified as the perpetrator, *the police can curtail their search activities.*" *Id.* at 451–52 (emphasis added) (citation omitted). "Other courts have stated that the propriety of using necessarily suggestive procedures hinges on whether there was 'good reason' to use such procedures." *Osman*, 2024 S.D. 15, ¶ 29, 4 N.W.3d at 567 (citing *Commonwealth v. Austin*, 657 N.E.2d 458, 461 (Mass. 1995)). The nature of the crime may cause concerns about ongoing threats to public safety that can justify the use of such suggestive procedures. *See Commonwealth v. German*, 134 N.E.3d 542, 558 (Mass. 2019) (citation omitted) ("There may be good reason for police to conduct a showup identification, notwithstanding its inherent suggestiveness, due to 'the nature of the crime involved and corresponding concerns for public safety[.]'").

[¶31.]     Law enforcement officers were investigating two drive-by shootings involving an unknown assailant or assailants. The rapid and efficient law

enforcement response quickly identified a potential suspect. However, until law enforcement could confirm they had the shooter, they could not be sure the public safety risk had been eliminated. The fact that the show-up procedure occurred while there was still an active search for the perpetrator "allowed the police to confirm that the identity of the suspect they had detained matched the description given and thus end their search for the driver of the vehicle." *Osman*, 2024 S.D. 15, ¶ 32, 4 N.W.3d at 568. Given these circumstances, the identification procedure utilized was necessary for public safety.

[¶32.] Because we determine that the show-up identification was necessary under the circumstances, "an analysis of the *Biggers* factors is not required." *Id.* ¶ 33, 4 N.W.3d at 569. The circuit court did not err in denying Turner's motion to suppress.

### 2. Whether the circuit court abused its discretion when it denied Turner's motion to dismiss the charges or exclude the ballistic expert's opinions.

[¶33.] In Turner's discovery requests, he asked to inspect the results of any "scientific tests." Turner argues that the State's late disclosure of Maritz's ballistic report was a violation of SDCL 23A-13-15 and that it caused him to suffer material prejudice. At the hearing on the matter, Turner argued first for dismissal. Alternatively, Turner argued that Maritz's report should be excluded. Finally, Turner argued, "If the Court doesn't believe dismissal of the indictment or exclusion is proper, we have alternatively requested a continuance." Orally ruling on the motion, the circuit court explained, "I don't believe there [was] bad faith involved in any of this. It's just an honest mistake." In the end, the circuit court gave Turner

two options: "Either the [Maritz report and] testimony comes in and we don't delay trial, or we delay trial and give you the chance to see what you want to do as far as [the defense's] expert is concerned." Turner chose the continuance.

[¶34.] "[T]he remedy for nondisclosure of discoverable material is left to the sound discretion of the trial court" and will not be disturbed absent an abuse of discretion. *State v. Onken*, 2008 S.D. 112, ¶ 18, 757 N.W.2d 765, 770 (alteration in original) (citation omitted). An abuse of discretion is "discretion exercised to an end or purpose not justified by, and clearly against, reason and evidence." *State v. Carter*, 2023 S.D. 67, ¶ 24, 1 N.W.3d 674, 685 (citation omitted). "[N]ot every failure to produce evidence as ordered is, without more, prejudicial error." *Onken*, 2008 S.D. 112, ¶ 18, 757 N.W.2d at 770 (alteration in original) (citation omitted). If we conclude that the circuit court did not abuse its discretion, "we need not determine whether [the defendant] was prejudiced[.]" *State v. Richard*, 2023 S.D. 71, ¶ 29, 1 N.W.3d 654, 661. Prejudice means "a reasonable probability that, but for [the error], the result of the proceeding would have been different." *Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d at 686 (alteration in original) (citation omitted).

[¶35.] Here, the circuit court did not abuse its discretion. Where a late discovery or disclosure occurs, SDCL 23A-13-17 outlines the remedies available to the circuit court in the event of a discovery violation. It provides:

> If, at any time during the course of a proceeding, it is brought to the attention of a court that a party has failed to comply with an applicable discovery provision, the court may order such party to permit the discovery or inspection, *grant a continuance*, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances. The court may specify the time, place, and

-14-

manner of making the discovery and inspection and may prescribe such terms and conditions as are just.

*Id.* (emphasis added).

[¶36.] After the circuit court was made aware of the State's late disclosure, the circuit court granted one of the forms of relief contemplated by SDCL 23A-13-17. It granted a continuance to give Turner an opportunity to prepare his response to the Maritz report. This was one of the alternative remedies Turner requested. Considering the statutory support for the circuit court's action and the fact that it was one of the remedies Turner requested, the circuit court did not abuse its discretion by allowing the Maritz report to be introduced.

### 3. *Whether the circuit court abused its discretion when it admitted the Milestone photograph into evidence.*

[¶37.] The abuse of discretion standard of review discussed at issue 2, *supra,* is the same for issue 3. Turner argues that Detective Gooch did not possess the requisite level of personal knowledge to lay a sufficient foundation under the business records exception for the admission of the Milestone photograph and the date and time stamps it contained. Turner notes that Detective Gooch did not print the photograph and did not know how the Milestone system was maintained or how the location and time were set and verified. The circuit court found that Detective Gooch could lay sufficient foundation and ruled:

> Detective Gooch -- my understanding from the testimony -- personally saw the traffic camera video footage and this still photo fairly and accurately depicts a still shot from that video footage. Detective Gooch was in the room when this picture was printed. And so I do think proper foundation has been laid for the admission of this particular exhibit.
>
> Ms. Werder made many points during her questioning but I think those go to the issue of weight and not admissibility, and

> she's welcome to ask those same questions when the jury comes
> back in.

The circuit court concluded that the date and time stamps on the photograph were admissible "based upon Detective Gooch's testimony that this camera -- traffic camera system is regularly used in the normal course of business and with investigations done [by] the City of Sioux Falls."

[¶38.] "Business records qualify for a hearsay exception if they are records of a regularly conducted business activity." *State v. Dickerson*, 2022 S.D. 23, ¶ 45, 973 N.W.2d 249, 265 (citation omitted). The exception requires:

> (A) The record was made at or near the time by—or from information transmitted by—someone with knowledge;
> (B) The record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
> (C) Making the record was a regular practice of that activity;
> (D) All these conditions are shown by the testimony of the custodian or another qualified witness, or by certification that complies with a rule or a statute permitting certification; and
> (E) The opponent does not show that the source of information or the method or circumstances of preparation indicate a lack of trustworthiness.

SDCL 19-19-803(6). "Thus, foundation for admissibility requires the 'testimony of the custodian or [an]other qualified witness' that the records have been prepared and kept in the course of a regularly conducted business activity." *State v. Stokes*, 2017 S.D. 21, ¶ 13, 895 N.W.2d 351, 355 (alteration in original) (quoting *DuBray v. S.D. Dep't of Soc. Servs.*, 2004 S.D. 130, ¶ 15, 690 N.W.2d 657, 662–63). "The custodian [or qualified witness] . . . 'need not be in control of or have individual knowledge of the particular . . . records . . ., but need only be familiar with the [business's] recordkeeping practices.'" *Dubray*, 2004 S.D. 130, ¶ 15, 690 N.W.2d at

-16-

662 (second alteration in original) (quoting *United States v. Weinstock*, 153 F.3d 272, 276 (6th Cir. 1998)).

[¶39.]     The Milestone photograph included a date stamp and a time stamp that purported to establish that this photograph was taken on the day of the shooting, roughly a minute before it occurred.  This temporal identification is one of the principal purposes for which the State wanted to introduce the photograph.  If the time and date described in the photograph were accurate, it placed Turner at that location at that date and time.

[¶40.]     Detective Gooch's testimony about how he used the Milestone system and the fact that he was present when the photograph was printed did not establish the required foundation necessary to invoke the business records exception.  Instead, his testimony went to authentication.  Authentication is the procedure by which a proponent of evidence produces "evidence sufficient to support a finding that the item is what the proponent claims it is."  SDCL 19-19-901(a).  Detective Gooch's testimony established that the photograph was printed from the Milestone system.  However, authentication is not the equivalent of foundation.  *Stokes*, 2017 S.D. 21, ¶ 18, 895 N.W.2d at 356.  To be admissible under the business records exception to the hearsay rule, the proponent must authenticate the document and satisfy the requirements of the exception.

[¶41.]     While Detective Gooch was not the custodian of the Milestone system, he could explain the system in general and describe how the photo was recovered from the system.  However, he was not able to testify about the operation of the system.  Specifically, he did not testify how the time and date were affixed to the

photograph and could not confirm that the time and date information was accurate. As a result, Detective Gooch "could only make assumptions about the date and time stamps on the document." *Dickerson*, 2022 S.D. 23, ¶ 46, 973 N.W.2d at 265. "While '[t]he phrase "another qualified witness" is given broad interpretation,' the witness must nonetheless possess 'enough familiarity with the record-keeping system of the entity in question to explain how the record came into existence in the course of a regularly conducted activity of the entity.'" *Id.* (alteration in original) (quoting *Stokes*, 2017 S.D. 21, ¶ 16, 895 N.W.2d at 356). The circuit court abused its discretion when it received the Milestone photograph into evidence because Detective Gooch could not lay a sufficient foundation to establish its admissibility under the business records exception to the hearsay rule.

[¶42.]     That being the case, there is not "a reasonable probability that, but for [the error], the result of the proceeding would have been different." *Carter*, 2023 S.D. 67, ¶ 26, 1 N.W.3d at 686 (alteration in original) (citation omitted). The photograph depicts Turner driving towards the shooting scene shortly before the shooting occurred. Turner did not contest that his vehicle was used during the shooting. Moreover, the record is replete with evidence connecting Turner's vehicle to the shooting, including Walters' accurate description of Turner's vehicle and license plate, camera footage at the shooting scene depicting that vehicle, and the match between the spent cartridge casings from the scene and those found in Turner's vehicle. But Turner argues that, aside from Driver's testimony, the photograph was the only thing placing Turner in the car at the time of the shooting. However, Turner was recorded leaving his house in his vehicle at 9:00 a.m. and

returning to his house, still driving his vehicle, three minutes after the shooting. When he was arrested, he had two .22 caliber bullets in his pocket and .22 caliber cartridges were found at the scene. Thus, there was substantial evidence introduced that established the same fact as the Milestone photograph—that Turner's vehicle was in the area when the shooting occurred and that Turner was in the vehicle. For that reason, there is no reasonable probability that the result of the proceedings would have been different if the Milestone photograph had not been admitted. Although the circuit court abused its discretion by admitting the Milestone photograph, Turner has not shown that this error prejudiced him.

### 4. Whether the circuit court erred in denying Turner's motion for judgment of acquittal on the discharge of the firearm counts involving SDCL 22-14-20.

[¶43.] At the close of the State's case, Turner moved for judgment of acquittal on the ground that the State failed to prove the elements of its case under SDCL 22-14-20. That statute provides: "Any person who willfully, knowingly, and illegally discharges a firearm at an occupied structure or motor vehicle is guilty of a Class 3 felony." *Id.* Turner contends that the modifier "occupied" applies to both "structure" and "motor vehicle." He asserts that the State presented no evidence that the vehicles were occupied at the time of the shooting. The circuit court denied this motion on the grounds that the terms "occupied structure" and "motor vehicle" are statutorily defined, and that those definitions were inconsistent with Turner's interpretation.

[¶44.] "We review a denial of a motion for judgment of acquittal de novo." *State v. Armstrong*, 2020 S.D. 6, ¶ 12, 939 N.W.2d 9, 12 (citing *State v. Brim*, 2010

-19-

S.D. 74, ¶ 6, 789 N.W.2d 80, 83). "We likewise review questions of statutory interpretation de novo." *Id.* (citing *State v. Johnsen*, 2018 S.D. 68, ¶ 9, 918 N.W.2d 876, 878).

[¶45.]    "We construe statutes to determine the intent of the Legislature." *Id.* ¶ 16, 939 N.W.2d at 13 (citing *State v. Geise*, 2002 S.D. 161, ¶ 10, 656 N.W.2d 30, 36). "The intent of the Legislature in enacting laws is ascertained primarily from the language used in the statute." *Id.* (quoting *State v. Bordeaux*, 2006 S.D. 12, ¶ 8, 710 N.W.2d 169, 172). "When the language in a statute is clear, certain and unambiguous, there is no reason for construction, and the Court's only function is to declare the meaning of the statute as clearly expressed." *Id.* (quoting *State v. Myrl & Roy's Paving, Inc.*, 2004 S.D. 98, ¶ 6, 686 N.W.2d 651, 654. "[Because] statutes must be construed according to their intent, the intent must be determined from the statute as a whole, as well as enactments relating to the same subject." *In re Estate of Ricard*, 2014 S.D. 54, ¶ 8, 851 N.W.2d 753, 756 (quoting *In re Estate of Hamilton*, 2012 S.D. 34, ¶ 7, 814 N.W.2d 141, 143).

[¶46.]    The question is whether the modifier "occupied" applies to both "structure" and "motor vehicle" as those terms appear in SDCL 22-14-20. "We have long held that 'whenever the meaning of a word or phrase is defined in any statute such definition is applicable to the same word or phrase wherever it occurs, except where a contrary intention plainly appears.'" *N. Border Pipeline Co. v. S.D. Dep't of Revenue*, 2015 S.D. 69, ¶ 13 n.9, 868 N.W.2d 580, 584 n.9 (quoting *State v. Howell*, 77 S.D. 518, 523, 95 N.W.2d 36, 39 (1959)); *see also* SDCL 2-14-4. Under SDCL 22-1-2(26), "motor vehicle" is defined as "any automobile, motor truck, motorcycle,

house trailer, trailer coach, cabin trailer, or any vehicle propelled by power other than muscular power[.]" While the term "structure" is also defined in SDCL 22-1-2(49), the phrase "occupied structure" has a distinct meaning and is defined separately. Under SDCL 22-1-2(28), an "occupied structure" is defined as "any structure: (a) [w]hich is the permanent or temporary habitation of any person, *whether or not any person is actually present*; (b) [w]hich at the time is specially adapted for the overnight accommodation of any person, *whether or not any person is actually present*; or (c) [i]n which at the time any person is present[.]" (Emphasis added.) Significantly, under this definition, a structure is an "occupied structure" even if no person is actually present. It would be inconsistent with that definition to view the term "occupied" as a modifier of "structure" and "motor vehicle" that requires a person to be present in both.

[¶47.] As used in SDCL 22-14-20, the word "occupied" was not intended to modify both terms. Instead, the statute refers to the phrases "occupied structure" and "motor vehicle" as they are independently defined in SDCL chapter 22-1. Because the meaning of these phrases is provided in SDCL 22-1-2, there is no need to engage in statutory construction.[7] Instead, using the legislative definitions of

---

7. Turner asks this Court to apply the "series-qualifier canon." Under the series-qualifier canon, "when there is a straightforward, parallel construction that involves all nouns or verbs in a series, a prepositive or postpositive modifier *normally* applies to the entire series." *Argus Leader Media v. Hogstad*, 2017 S.D. 57, ¶ 8 n.2, 902 N.W.2d 778, 781 n.2 (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 147 (2012)). "However, . . . '[p]erhaps more than most of the other canons, [the series-qualifier canon] is highly sensitive to context.'" *Id.* ¶ 8, 902 N.W.2d at 781 (alteration in original) (citation omitted). Because we conclude that the context of SDCL 22-14-20, and the definitions in Title 22

(continued . . .)

those terms leads to the conclusion that the State did not need to prove that the motor vehicles were occupied at the time of the shooting. The circuit court did not err in denying Turner's motion for judgment of acquittal.

### 5. Whether the circuit court abused its discretion in denying Turner's proposed jury instructions.

[¶48.] Turner appeals the circuit court's denial of three of his proposed jury instructions. The first, instruction 101, was consistent with Turner's interpretation of SDCL 22-14-20, discussed at issue 4, *supra*. The circuit court denied this instruction because it concluded the instruction was based on an incorrect statement of the law. The second and third, instructions 109 and 110, both related to eyewitness identifications. The circuit court denied these instructions because it "believe[d] those issues [were] adequately covered in the other jury instructions."

[¶49.] "Our standard of review of a circuit court's denial of a proposed jury instruction is well settled." *State v. Randle*, 2018 S.D. 61, ¶ 32, 916 N.W.2d 461, 469 (citing *State v. Shaw*, 2005 S.D. 105, ¶ 18, 705 N.W.2d 620, 625).

> We review a trial court's refusal of a proposed instruction under an abuse of discretion standard. The trial court has broad discretion in instructing the jury. Jury instructions are satisfactory when considered as a whole, they properly state the applicable law and inform the jury. Error in declining is reversible only if it is prejudicial, and the defendant has the burden of proving prejudice.

*Id.* ¶ 32, 916 N.W.2d at 469–70 (citation omitted). An abuse of discretion is "discretion exercised to an end or purpose not justified by, and clearly against,

---

(. . . continued)
require a different conclusion than would be reached via the series-qualifier canon, we decline to utilize it in construing SDCL 22-14-20.

reason and evidence." *Carter*, 2023 S.D. 67, ¶ 24, 1 N.W.3d at 685 (citation omitted). An erroneous instruction is prejudicial if there is "a reasonable probability that, but for [the error], the result of the proceeding would have been different." *Id.* ¶ 26, 1 N.W.3d at 686 (alteration in original) (citation omitted).

[¶50.] Turner's proposed instruction 101 is premised on his interpretation that the State was required to prove that Turner fired at an "occupied vehicle." As explained in the preceding section, this argument is misplaced. Consequently, the circuit court did not abuse its discretion in denying this proposed instruction. *See State v. Cottier*, 2008 S.D. 79, ¶ 7, 755 N.W.2d 120, 125 (citation omitted) ("[N]o court has discretion to give incorrect . . . instructions: to do so constitutes reversible error[.]").

[¶51.] Proposed instruction 109 provided that the jury must be satisfied beyond a reasonable doubt regarding the accuracy of an identification before it may convict. Proposed instruction 110 instructed the jury to consider all the surrounding circumstances at the time the identification was made when deciding whether to rely on it.

[¶52.] "In order to determine whether the identification instruction should have been given, we review whether the eyewitness testimony is essential to support a conviction." *State v. Brings Plenty*, 490 N.W.2d 261, 267 (S.D. 1992) (citing *United States v. Greene*, 591 F.2d 471, 475 (8th Cir. 1979)).

[¶53.] The State presented substantial evidence beyond eyewitness identification. This includes the 911 caller's description of Turner's car and the exact license plate number, videos recorded at the scene of the shooting and

Turner's home following the shooting, and the spent cartridges found at the scene of the shooting and in Turner's vehicle. Consequently, the State did not need to prove beyond a reasonable doubt that the eyewitness identification was accurate and believable. The State was required to present evidence that convinced the jury, beyond a reasonable doubt, that Turner was the shooter. The circuit court's instruction 33 explained the jury's role with respect to witnesses. Instruction 33 read:

> You are the sole and exclusive judge of all questions of fact and the credibility of the witnesses and the weight to be given the testimony of each of them.
>
> In determining the credit to be given any witness you may take into account ability and opportunity to observe, memory, manner while testifying, any interest, bias, or prejudice, and the reasonableness of the testimony considered in light of all the evidence in the case.

The circuit court's instruction 45 explained the burden of proof as follows:

> If under the court's instructions and the evidence you find beyond a reasonable doubt that the defendant committed the acts constituting the elements of the offense charged in a count, then it is your duty to find the defendant guilty of the offense charged in that count.

[¶54.] Instruction 33 instructed the jury to assess the credibility of witnesses, and instruction 45 recited the proper standard of proof. Together, the court's instructions properly instructed the jury. The circuit court did not abuse its discretion in denying Turner's proposed instructions.

### 6. *Whether the circuit court abused its discretion when it denied Turner's motion for a new trial.*

[¶55.] After the jury rendered its guilty verdicts, Turner moved for a new trial. He claimed the State committed a *Brady* violation by not saving the

Milestone video and that the State elicited false testimony from Flores. The circuit court denied Turner's requests. "This Court reviews the circuit court's 'denial of a motion for a new trial under the abuse of discretion standard.'" *State v. Timmons*, 2022 S.D. 28, ¶ 19, 974 N.W.2d 881, 888 (citation omitted).

[¶56.] The Due Process Clause of the Fourteenth Amendment includes an implicit guarantee that "criminal defendants be afforded a meaningful opportunity to present a complete defense." *State v. Zephier*, 2020 S.D. 54, ¶ 20, 949 N.W.2d 560, 565 (quoting *California v. Trombetta*, 467 U.S. 479, 485, 104 S. Ct. 2528, 2532, 81 L. Ed. 2d 413 (1984)) The cases that involve a defendant's "guaranteed access to evidence" generally fall into two categories–"cases in which the exculpatory value of the undisclosed evidence is known and cases where it is not." *Id.* ¶¶ 20–21, 949 N.W.2d at 565.

[¶57.] The first category of cases "is illustrated by the prototypical violation of the rule set out in *Brady v. Maryland* where a prosecutor does not share information or evidence that is, nevertheless, identifiable and intact, and is 'either material to the guilt of the defendant or relevant to the punishment to be imposed.'" *Id.* ¶ 21, 949 N.W.2d at 565 (quoting *Trombetta*, 467 U.S. at 485, 104 S. Ct. at 2532). "Whether the prosecution's suppression of this type of evidence will lead to a due process violation that results in a new trial turns on the materiality of the suppressed evidence—not the good faith or bad faith of the prosecutor." *Id.* (citing *State v. Birdshead*, 2016 S.D. 87, ¶ 18, 888 N.W.2d 209, 215). This case does not fall within this category because the Milestone video no longer exists. The Milestone system automatically deleted that video footage after 90 days.

[¶58.]     The deleted Milestone footage falls in the second category. "Included in this grouping are cases where the exculpatory value of undisclosed evidence is unknown because it has been destroyed, lost, or compromised in some way." *Id.* ¶ 22, 949 N.W.2d at 566. In such cases, we apply the backward-looking rule set out in *Trombetta* to determine the materiality of such evidence:

> Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality . . . evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Trombetta*, 467 U.S. at 488–89, 104 S. Ct. at 2534 (citation omitted).

[¶59.]     "However, *Trombetta's* materiality test will not resolve all due process challenges in cases of lost or destroyed evidence." *Zephier*, 2020 S.D. 54, ¶ 24, 949 N.W.2d at 566 (citation omitted). "In some instances, this evidence cannot satisfy the materiality test, and the most that could be said is that it 'could have been subjected to tests, the results of which might have exonerated the defendant.'" *Id.* (quoting *Arizona v. Youngblood*, 488 U.S. 51, 57, 109 S. Ct. 333, 337, 102 L. Ed. 2d 281 (1988)). In cases "involving only 'potentially useful' lost or destroyed evidence . . . a defendant must show that law enforcement acted in bad faith to establish a due process violation[.]" *Id.* (citing *Youngblood*, 488 U.S. at 58, 109 S. Ct. at 337). This rule comports with the United States Supreme Court's reasoning in *Youngblood*:

> [R]equiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of

> cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant.

*Youngblood*, 488 U.S. at 58, 109 S. Ct. at 337.

[¶60.] As described, the video showed Turner driving towards the scene of the shooting minutes before it occurred. There is nothing in this record that suggests the video possessed any apparent exculpatory value. Consequently, we need not determine whether Turner "would be unable to obtain comparable evidence by other reasonably available means." *Zephier*, 2020 S.D. 54, ¶ 23, 949 N.W.2d at 566 (quoting *Trombetta*, 467 U.S. at 491, 104 S. Ct. at 2535). Similarly, there is nothing in this record that suggests the lost video was "potentially useful" to the defense. Consequently, we need not evaluate whether law enforcement acted in bad faith when failing to recover and maintain the video. *Id.* ¶ 24, 949 N.W.2d at 556. Based on this record, the circuit court did not abuse its discretion in denying Turner's new trial motion related to the Milestone video.

[¶61.] Turner also premised his new trial motion on his claim that the State elicited false testimony from Flores. "[A] *Brady* violation not only results from the government's suppression of favorable evidence, but also, 'where previously undisclosed evidence reveal[s] that the prosecution introduced trial testimony that it knew or should have known was perjured[.]'" *State v. Leisinger*, 2003 S.D. 118, ¶ 19, 670 N.W.2d 371, 375 (second and third alterations in original) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433, 115 S. Ct. 1555, 1565, 131 L. Ed. 2d 490 (1995)). "[A] conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false

testimony could have affected the judgment of the jury." *Id.* (quoting *United States v. Agurs*, 427 U.S. 97, 104, 96 S. Ct. 2392, 2397, 49 L. Ed. 2d 342 (1976)).

[¶62.] The circuit court did not abuse its discretion when it denied Turner's motion for a new trial regarding Flores' trial testimony. First, Turner's argument that "[t]he State knew Flores' testimony at trial about [how] many people she saw in the car was false[,]" is not supported by any evidence in the record. The record contains no evidence that the State and Flores had any conversations regarding her anticipated trial testimony after she was interviewed by law enforcement. Nor does the record contain any evidence showing that the State had any reason to believe Flores would testify differently than in her law enforcement interview. Instead, it appears the State called Flores to testify consistent with the content of her law enforcement interview. Second, because there is no indication the State intended to introduce perjured testimony, its obligation under *Brady* was satisfied when it disclosed the content of her law enforcement interview to Turner.

[¶63.] Furthermore, even if Flores' testimony was false, there is no "reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* (quoting *Agurs*, 427 U.S. at 104, 96 S. Ct. at 2397). After Flores testified on direct examination that she did not see how many people were in the shooter's vehicle, Turner devoted virtually the entirety of his cross-examination to the discrepancy between her statements during her law enforcement interview and those made at trial. In fact, a portion of Flores' law enforcement interview, in which she described how many people were in the vehicle, was played for the jury during this cross-examination. In addition, Turner called another witness to testify as to

Flores' contradictory statements made during his counsel's interviews with Flores. The jury had all of this information available when it made its assessment of the value of Flores' testimony. The circuit court did not abuse its discretion when it denied Turner's motion for a new trial.

## Conclusion

[¶64.] Although the show-up identification was suggestive, it was necessary under the circumstances, and the circuit court did not err when it denied the motion to suppress. The circuit court did not abuse its discretion when responding to the late disclosure of the ballistics report by continuing the trial to allow Turner time to prepare to respond to the report. The circuit court abused its discretion when it concluded that Detective Gooch could lay adequate foundation to establish the business records exception for the Milestone photograph. However, this error was not prejudicial. The circuit court did not abuse its discretion when it denied Turner's motion for judgment of acquittal because the motion was premised on an incorrect interpretation of SDCL 22-14-20. The circuit court did not abuse its discretion when it denied Turner's proposed jury instructions. Finally, the circuit court did not abuse its discretion when it denied Turner's motion for a new trial because the State did not withhold evidence with apparent exculpatory value, and the evidence in the record does not support the argument that the State elicited false testimony. We affirm.

[¶65.] JENSEN, Chief Justice, and KERN, SALTER, and DEVANEY, Justices, concur.